CHARLES P. DIAMOND (SB # 56881)
LAW OFFICES OF CHARLES P. DIAMOND
cdiamond@omm.com
AMY R. LUCAS (SB # 264034)
alucas@omm.com
1999 Avenue of the Stars, 8th Floor
Los Angeles, California 90067-6035
Telephone: +1 310 553 6700
Facsimile: +1 310 246 6779

RICHARD P LASTING (SB # 53950)
RICHARD P LASTING LAW OFFICES
richardplasting@sbcglobal.net
315 East 8th Street, Suite 801
Los Angeles, CA 90014
Telephone: +1 213-489-9025
Facsimile: +1 310-626-9677

Attorneys for Defendant
Juan Sanchez

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> MICHAEL LERMA,, et al., <br><br> Defendants. | Case No. 2: 18- CR-172-GW-4 <br><br> **SUPPLEMENTAL DECLARATION OF ROY T. GRAVETTE IN OPPOSITION TO MIL #5; EXHIBIT D** <br><br> HEARING DATE: FEB. 10, 2025 <br> TIME: 1:00 PM <br> COURTROOM: 9D <br> HON. GEORGE H. WU |

I, Roy T. Gravette, declare as follows:

1. I am a retired federal Bureau of Prisons Associate Warden who for the past fifteen years has remained active in the corrections field, including as a consultant to the legal profession on matters involving the Bureau of Prisons and best practices with respect to prison security and ensuring the safety and well-being of prison inmates.

2. I understand that the time of the decedent's death in this case has made

relevant the BOP's processes for continually ensuring that inmates are alive and well and present where they are supposed to be. In statements provided to the FBI, various MDC-LA correctional officers have referred to the "count," and various MDC-LA documents, including unit logs, schedules and the lieutenants' logs refer to the "count" and related procedures  A principal aspect of my anticipated testimony is to explain to the jury the meaning of the term "count," to describe when and how BOP institutions across the country conduct the "count," to describe the training BOP requires of its correctional officers concerning "count procedures," to discuss count infractions in the context of the BOP's disciplinary system, and to place the "count" in the hierarchy of functions that federal correctional officers perform. I also expect to distinguish "standup" counts from others, and to explain how BOP correctional officers nationwide are trained to conduct them. Having conducted counts and "standup" counts as a correctional officer for over a decade, having supervised the count as a lieutenant, captain and associate warden at various BOP prisons, detention centers and penitentiaries for another decade, having trained thousands of correctional officers in proper count procedures, and having disciplined inmates and staff who have undermined an orderly count, I am intimately familiar with this subject.

3.    Although the Court has previously received by CV, I provide the following summary of my BOP career, which over twenty years involved postings through the Southeast and Midwest at every security tier the BOP operates. I began as a probationary correctional officer in 1990 at the Federal Correctional Institution ("FCI") Talladega, Alabama, which was a medium security facility. After completing my training at the Federal Law Enforcement Training Center in Glynco, Georgia, I returned to Talladega, and over the next three years worked my way up to Senior Officer Specialist. In October 1993, I was promoted to Lieutenant and assigned to bring online a new Federal Detention Center in Miami, Florida. Like the MDC-LA, that facility was considered an "administrative facility" in that it

accommodated inmates and detainees of all security levels. While in Miami, I also did temporary duty at the Metropolitan Correctional Center in Miami, which, like the MDC-LA, is also an administrative facility.

4. I left Miami in June 1995 and became the Administrative Lieutenant at the FCI Estill, South Carolina, a medium security facility. Two years later, I was promoted to captain and assigned to the Federal Detention Center ("FDC") in Oakdale, Louisiana, also an administrative facility like MDC-LA. In August 1998, I became a captain at FCI Edgefield in South Carolina, a high security facility. I spent the balance of my career as an associate warden, first returning in 2001 to FCI Talladega where I began my BOP career, and later (2003) to the Federal Correctional Complex at Beaumont, Texas, initially at its medium security facility and then at the penitentiary there. I completed my BOP career at the FCI at Three Rivers, Texas, where I served from 2007 until my retirement in June 2010.

5. Since separating from the BOP, I have remained active in the correctional field, both as an employee doing oversight of jails and prisons, as a member of professional correctional organizations,[1] and as an independent consultant working on matters involving prison security and inmate safety. In that latter capacity, I have remained closely connected with the BOP and its facilities throughout the County. By my most recent count, I have been asked to study, assess and opine on the security practices of nearly two dozen BOP facilities, most of which I had not personally worked at, including practices designed to ensure the presence and safety of inmates in the BOP's custody. They are listed below in reverse chronological order; those in which I provided a written report and/or testimony are indicated by an asterisk.

| YEAR | FACILITY | SUBJECT |
|---|---|---|
| 2024 | MDC-New York | Inmate supervision |

---

[1] I am a member of the American and Louisiana Correctional Associations.

- 3 -

SUPPLEMENTAL DECLARATION
OF ROY T. GRAVETTE

| 2024 | FCI Petersburg, VA | Inmate supervision |
|---|---|---|
| 2023 | USP Beaumont, TX | BOP murder investigation/prevention |
| 2023 | Federal Medical Center, Springfield, IL | Inmate supervision |
| 2022* | FCI Milam, MI | Inmate supervision |
| 2022* | USP Victorville, CA | Inmate gang/prison culture |
| 2022 | FCI Edgefield, SC | BOP assault investigation/prevention |
| 2022 | USP Lee, VA | BOP contraband policies and procedures |
| 2022* | FCI Victorville, CA | Supervision during inmate murder |
| 2020 | FMC Fort Worth, TX | BOP medical services provision |
| 2020 | FCI Oakdale, LA | Supervision during inmate assault |
| 2020* | MCC New York | Supervision during inmate assault |
| 2019 | USP Lewisburg | Supervision leading to inmate stabbing |
| 2019* | USP Victorville CA | Prison culture/inmate-on-inmate assault |
| 2018 | FDC Hawaii | BOP food service policies |
| 2018* | Federal Prison Camp Phoenix, AZ | BOP inappropriate relationship policies |
| 2018 | BOP, Sp. Housing Units | Inmate discipline and classification |
| 2018* | FDC Sea-Tac Seattle, WA | BOP medical services provision |
| 2017* | USP Beaumont, TX | Gang-related violence |
| 2017 | USP, Victorville CA | Supervision during inmate-on-inmate assault |
| 2016* | Federal Medical Prison Springfield MO | BOP conditions of confinement policies |
| 2016* | FDC Philadelphia | BOP housing and classification policies |
| 2016* | MDC-New York | Supervision during inmate murder |
| 2014* | MCC-San Diego, CA | BOP housing and classification policies |
| 2013 | USP Beaumont, TX | Supervision during inmate murder |
| 2012* | USP Canaan, PA | BOP staffing and security policies |
| 2011* | USP Allenwood, PA | Supervision and classification |

- 4 -

SUPPLEMENTAL DECLARATION
OF ROY T. GRAVETTE

1  These are only a fraction of the matters on which I have been asked to consult as a
2  corrections expert. Many more involve correctional practices at state, local and
3  parish jails and prisons. By my most recent count, over the past fifteen years I have
4  provided reports or testimony, or consulted, on over 315 separate matters.

5        6.    In connection with my federal engagements, I necessarily refreshed
6  myself on BOP policies and practices and updated myself on the few new ones.
7  These engagements also brought me into contact with BOP operational and
8  supervisory personnel throughout the United States. Through studying and
9  personal relationships, and attendance at meetings and conferences of correctional
10 professionals, I have remained current on BOP policies and practices at issue in this
11 case, including the monitoring, supervision and regular counting of the inmate
12 population. This includes administrative facilities like the MDC-LA that house
13 sentenced inmates as well as pretrial detainees, as my federal experience
14 encompasses controversies over practices at many other administrative facilities,
15 including the MDC-New York, the Metropolitan Correction Center ("MCC")-New
16 York, the Federal Detention Center ("FDC")-Hawaii, the FDC-Philadelphia, and
17 the MCC-San Diego.

18       7.    To know how things operate at a particular federal facility, one only
19 needs to be conversant with BOP national policy, as there is very little local
20 variation in the manner in which federal facilities ensure the presence, safety and
21 security of the inmate population. Like the military, the BOP manages from top
22 down. Since well before my association with it, the BOP has issued a standard set
23 of policies and procedures applicable to every facility under its control. So, for
24 example, BOP regulations provide that its facilities perform at least five counts per
25 day with a required "stand-up" count at 4 pm local time. At 4 pm *every* day, *every*
26 BOP facility in the country ceases all operations, counts its inmates, and resumes
27 only when the tally corresponds to the master count in the Control Center. Local
28 variations to this or other practices require BOP approval and incorporation into a

written supplement, relevant portions of which for the MDC-LA I have requested in discovery.[2] MDC-LA does nothing differently, as to counts or any other operation as to which I expect to testify.[3]

8. This is particularly true with respect to the "count," an essential part of ensuring institutional safety and security. The BOP's policies are prescribed in Chapter 3 of its "Correctional Services Procedures Manual," a thick volume of regulations that existed when I worked for BOP and long before. The Manual was revised once since my retirement, in 2012, but only to restate existing practices. BOP has changed it only once since, in August 2016, when it altered the calculation of the required number of staff at any institution. The Correctional Services Procedures Manual prescribes the inmate accountability practices required of all 122 BOP facilities. (A copy is attached as Exhibit D.)

9. During my 15 years of providing expert testimony, I have regularly been permitted to offer testimony concerning correctional practices taking place long after my retirement as a correctional officer in 2010. Representative is the decision three years ago of the Western District of Oklahoma in *Willis v. Oklahoma Cty. Detention Ctr.*, Doc. No. 183, Case. No. 5:18-cv-00323-D, at p. 8 (W.D. Okla. Jan. 5, 2022) ("Mr. Gravette's opinions assess whether Defendants' conduct was consistent with, or contrary to, established custom and practice. And as a qualified corrections expert, Mr. Gravette's method—reviewing the numerous materials that document the facts of this case, applying his general knowledge of correctional standards, which he gained from his extensive experience and training, and

---

[2] The BOP has declined to share the MDC-LA's local supplements with me. They have been reviewed (though not copied) by defense counsel, who assure me that they contain nothing material to my anticipated testimony.

[3] As set forth in my Rule 16 disclosure and supplemental disclosure, I also expect to provide testimony concerning facility temperatures that must be maintained at BOP-operated correctional centers. That is governed by another tome BOP of regulations, the 135-page Facilities Operations Manual, which has no changed since 2017.

comparing Defendants' conduct to those standards—is reliable."). See also *Harris v. Bowser*, Doc. No. 72, Case No. 18-768 (CKK), at p.28 (D.D.C. Oct. 1, 2021) ("Mr. Gravette's opinion regarding the DOC policy to restrain persons who are NGRI [not guilty by reason of insanity] while they are transported to court is relevant because the professional judgment underlying that policy involves overriding safety and security considerations. Therefore, it is appropriate to consider the expertise of a person with correctional expertise as to whether that policy comports with accepted standards of professional judgment.").

10.  Nor has any court barred me from testifying about a jail or prison I have not worked at, accepting instead my general familiarity with correctional policies and procedures as a basis for explaining supervisory conduct at particular institutions. *See Hicks-Field v. Pool*, Doc. No. 163, Case No. H-12-3650, at p. 7 (S.D. Tex. Sept. 23, 2015) ("Although he has never worked in a Texas county jail, Gavrette [sic] has familiarized himself with the applicable regulations and will offer his opinions referencing those standards."); *Ali v. Stephens*, Doc. No. 330, Case No. 9:09-CV-52, at pp. 4-5 (E.D. Tex. July 11, 2014) ("Although Mr. Gravette's first-hand knowledge of TDCJ facilities is limited to visiting one unit and reviewing documents, that goes to the weight of his testimony, not its admissibility."). As in those cases, I have reviewed the BOP discovery produced in this case and viewed hours of surveillance video documenting how MDC-LA correctional officers performed their duties.

11.  In the past two years, I have qualified in this District to testify as an expert on the expected level of inmate supervision at two federal correctional facilities, the U.S. Penitentiary at Victorville, California and the Medium II FCI at Victorville, facilities I never visited. *See United States v. Christopher Ruiz*, 5:18-cr-00250-CJC-3 (Judge Carney); *United States v. Kertesz*, 5:20-cr-00012-JGB-1 (Judge Bernal). In neither case did the U.S. Attorney's Office object to my testimony or seek to exclude it.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated:  February 4, 2025

_____
Roy T. Gravette.