# EXHIBIT D



**U.S. Department of Justice**
Federal Bureau of Prisons

C H A N G E   N O T I C E
OPI:          CPD/CPB
NUMBER:    5500.14, CN-1
DATE:         August 1, 2016

# Correctional Services Procedures Manual

/s/
*Approved*:  Thomas R. Kane
Acting Director, Federal Bureau of Prisons

This Change Notice (CN) implements the following change to Program Statement 5500.14, **Correctional Services Procedures Manual**, dated October 19, 2012.  Chapter 1, page 1, paragraph 2 will read as follows.  Changes are marked with a ==highlight==.

```
In order to allow for training and annual/sick leave, a position
is calculated at 210 days per year.   The subtotal (man days) is
divided by 210.   The result is the number of positions required
to staff the Correctional Services Department.

Example:  50 (total number of 7 Day Posts) x 364 = 18,200

          20 (total number of 5 Day Posts) x 260 =  5,200

          10 (total number of 3 Day Posts) x 156 =  1,560
                              Subtotal: 24,960 (total man days)

     24,960 divided 210 = 118 positions plus 180 man days,
     which equals 119 positions.  A remainder of 72 or more is
     one additional position.
```



U.S. Department of Justice
Federal Bureau of Prisons

# Program Statement

OPI: CPD
NUMBER: 5500.14
DATE: 10/19/2012
SUBJECT: Correctional Services Procedures Manual

1.  PURPOSE AND SCOPE.  To implement policies, procedures, and guidelines to protect the public and maintain a secure, safe and orderly living and working environment for inmates and staff.

This Program Statement promotes standard management practices for correctional staff in all Bureau institutions, while recognizing differences among institutions that vary in missions and security levels.

2.  PROGRAM OBJECTIVES.  The expected results of this program are:

  a.  Security posts will be established through meaningful post orders; using a standard roster.

  b.  Security will be maintained by well-trained, highly professional correctional staff, guided by clearly written policy and procedures and led by Captains and Lieutenants who monitor operations, train, advise, and consult with those staff.

  c.  Tools, equipment, and materials will be properly used, stored, and inventoried.

  d.  Continuous inmate accountability will be maintained through a system of accurate counts and census checks.

  e.  Trained canine units will be established in approved Bureau institutions and be available to other institutions as needed.

  f.  When mutual Bureau/FBI activity is required to resolve an emergency incident, prior exchange of information and planning will have occurred, and a plan of action will be in place and applied.

g.  Major incidents will be investigated by After-Action Review Teams, appointed by Regional Directors.

h.  Staff will be assigned to posts or duties requiring the use of firearms only after receiving training and continued requalification with the issued weapon.

i.  Inmates sent from Bureau institutions to local medical facilities for medical treatment will be supervised by competent and qualified contract personnel when appropriate.

3.  DIRECTIVES AFFECTED

a.  Directives Rescinded

| | |
|---|---|
| PS 1440.01 | Providing Emergency Assistance to Local Law Enforcement Agencies (5/18/94) |
| PS 5500.08 | Canine Units, Full Service (9/17/97) |
| PS 5500.10 | Guard Service at Local Medical Facilities (3/1/99) |
| PS 5511.06 | Accountability for Inmates (8/4/97) |
| PS 5558.14 | Firearms and Badges (8/24/00) |
| PS 5568.05 | After-Action, Reporting and Review (10/26/00) |

b.  Directives Referenced

| | |
|---|---|
| PS 1210.23 | Management Control and Program Review (8/21/02) |
| PS 1280.11 | JUST, NCIC, and NLETS Telecommunications Systems (1/7/00) |
| PS 1380.05 | Special Investigative Supervisors Manual (8/1/95) |
| PS 1480.05 | News Media Contacts (9/21/00) |
| PS 1600.08 | Occupational Safety and Environmental Health (8/16/99) |
| PS 2000.02 | Accounting Management Manual (10/15/86) |
| PS 3000.02 | Human Resource Management Manual (11/1/93) |
| PS 3420.09 | Standards of Employee Conduct and Responsibility (2/5/99) |
| PS 3906.16 | Employee Development Manual (3/21/97) |
| PS 4400.04 | Property Management Manual (8/13/01) |
| PS 4500.04 | Trust Fund/Warehouse/Laundry Manual (12/15/95) |
| PS 5100.07 | Security Designation and Custody Classification Manual (9/3/99) |
| PS 5162.04 | Categorization of Offenses (10/9/97) |
| PS 5216.05 | Juvenile Delinquents, Juvenile Justice and Delinquency Prevention Act (9/01/99) |
| PS 5324.03 | Suicide Prevention Program (5/3/95) |

| PS 5538.04 | Escorted Trips (12/23/96) |
| PS 5566.05 | Use of Force and Application of Restraints on Inmates (7/25/96) |
| PS 5580.06 | Personal Property, Inmate (7/19/99) |
| PS 5800.13 | Inmate Systems Management (6/28/02) |
| PS 5800.10 | Mail Management Manual (11/30/95) |
| PS 5890.13 | SENTRY National On-line Automated Information System (12/14/99) |
| PS 6000.05 | Health Services Manual (9/15/96) |

U.S. Department of Justice Office of Investigative Agencies Policies, Resolution 14, and Attachments A and B (Policy Statement-Use of Deadly Force and Commentaries) (10/17/95)

4. STANDARDS REFERENCED

   a. American Correctional Association 4th Edition Standards for Adult Correctional Institutions: 4-4091(M), 4-4172, 4-4174, 4-4177, 4-4178, 4-4179, 4-4180, 4-4181, 4-4182, 4-4183, 4-4184, 4-4185, 4-4187, 4-4188, 4-4196, 4-4202, 4-4204(M), and 4-4205(M)

   b. American Correctional Association 3rd Edition Standards for Adult Local Detention Facilities:  3-ALDF-1D-18(M), 3-ALDF-1F-05, 3-ALDF-2G-03, 3-ALDF-3A-03, 3-ALDF-3A-05, 3-ALDF-3A-06, 3-ALDF-3A-07, 3-ALDF-3A-08, 3-ALDF-3A-11, 3-ALDF-3A-12, 3-ALDF-3A-14, 3-ALDF-3A-15, 3-ALDF-3A-22, 3-ALDF-3A-28, 3-ALDF-3A-30, and 3-ALDF-3A-32(M)

   c. American Correctional Association 2nd Edition Standards for Administration of Correctional Agencies: 2-CO-3A-01

   d. American Correctional Association Standards for Adult Correctional Boot Camp Programs:  None

5. PRETRIAL/HOLDOVER PROCEDURES.  Procedures required in this Program Statement apply to pretrial/holdover inmates and INS Detainees in Bureau Custody.

6. DEFINITIONS.  Throughout this Program Statement, there is reference to guidelines and requirements based on the security levels of institutions.  For the purpose of security level identification, administrative facilities will be governed under the same guidelines as medium security facilities, unless otherwise noted.

7. REPRODUCTION OF ATTACHMENTS.  All attachments included in this Program Statement may be reproduced locally or acquired via BOPDOCS.

8.   RETENTION OF DOCUMENTS FOR CORRECTIONAL SERVICES.  In order to maintain a record of past information, the retention of these documents must be stored for future reference.  The duration for each document is listed on the Retention of Documents List (Attachment A).

9.   IMPACT ON MASTER AGREEMENT.  This document is to be reviewed in conjunction with the negotiated Master Agreement.  If there are any contradictions between the two documents, the Master Agreement will prevail.

10.  INSTITUTION SUPPLEMENTS.  The following provisions of this Manual require Institution Supplements:

  a.  Chapter 2 (page 1), Section 200.1, tool control procedures and tool control inspection system.

  b.  Chapter 2 (page 2), Section 201.2, a list of all tools by Class AA, A, and B including descriptions and size of all tools currently in use.

  c.  Chapter 2 (page 4), Section 204.2, procedures for using the Government-wide Credit Card Program to purchase tools.

  d.  Chapter 2 (page 9), Section 207.1, procedures to carry out the tool survey process including the destruction of any surveyed tools.

  e.  Chapter 3 (page 4), Section 304.1, guidelines and procedures for conducting census checks.


                                        /s/
                              Charles E. Samuels, Jr.
                              Director

PS 5500.14
10/19/2012
Table of Contents, Page i

TABLE OF CONTENTS

CHAPTER 1
MANAGEMENT OF CORRECTIONAL SERVICES

100  COMPUTING THE CORRECTIONAL COMPLIMENT
101  QUARTERLY AND DAILEY ROSTER ASSIGNMENT
102  OFFICER ASSIGNMENT RECORD
103  PREPARATION, USE, AND DISTRIBUTION OF POST ORDERS
104  OPERATIONAL REVIEW OF CORRECTIONAL SERVICES
105  LIEUTENANTS' MEETINGS
106  INTELLIGENCE BRIEFINGS
107  UNIFORM REGULATIONS


CHAPTER 2
TOOLS AND HAZARDOUS MATERIALS

200  RESPONSIBILITIES
201  TOOL CLASSIFICATION
202  TOOL IDENTIFICATION
203  STORAGE IN WORK AREAS
204  TOOL INVENTORIES
205  ISSUING TOOLS
206  LOST TOOLS
207  DISPOSITION OF EXCESS TOOLS
208  WEAPON MANUFACTURE CONTROL
209  CONTROL OF FLAMMABLE, HAZARDOUS, POISONOUS
     MATERIALS AND CHEMICALS
210  CONTROL OF DANGEROUS DRUGS AND HYPODERMIC APPARATUS
211  CONTROL OF FOOD SERVICE EQUIPMENT


CHAPTER 3
COUNTS - CENSUS CHECKS

300  BASIC PRINCIPLES
301  OFFICIAL COUNTS
302  EMERGENCY COUNTS
303  OFFICIAL COUNT FORM
304  CENSUS COUNTS
305  CONTROL CENTER RECORDS
306  DAILY CHANGE/TRANSFER SHEET
307  INMATE CALL-OUTS
308  PASS SYSTEM
309  DETAIL/CREW KIT CARDS
310  SPECIAL ACCOUNTABILITY

PS 5500.14
10/19/2012
Table of Contents, Page ii

CHAPTER 4
EMERGENCY ASSISTANCE TO NON-FEDERAL CORRECTIONAL SYSTEMS

400 BACKGROUND
401 DEFINITION
402 MEMORANDUM OF UNDERSTANDING
403 REVIEW BY/NOTIFICATION OF REGIONAL DIRECTOR AND ASSISTANT
    DIRECTOR
404 TYPICAL ASSISTANCE AND GUIDELINES
405 CRISIS MANAGEMENT TEAM
406 SUPPORT ASSISTANCE BY OTHER FEDERAL AGENCIES
407 REPORTING REQUIREMENTS
408 ANNUAL REVIEW OF MEMORANDUM OF UNDERSTANDING
409 ASSISTANCE

CHAPTER 5
CANINE UNITS

500 ADMINISTRATION
501 HANDLER SELECTION
502 CANINE SELECTION
503 HANDLER RESPONSIBILITIES
504 EMPLOYEE GUIDELINES
505 HEALTH, CARE, AND FEEDING
506 TRAINING
507 TRAINING DOCUMENTATION
508 PROCUREMENT

CHAPTER 6
AFTER-ACTION REVIEW AND REPORTING

600  DEFINITIONS
601  AFTER-ACTION REVIEW TEAM
602  AFTER-ACTION REVIEW TEAM FOR DISCHARGE OF FIREARM
603  SHOOTING INCIDENT REVIEW COMMITTEE
604  AFTER-ACTION REPORT FORMAT
605  INMATE INVOLVEMENT
606  SUMMARY REPORT FORMAT
607  DISCLOSURE OF BUREAU STAFF NAMES IN MAJOR INCIDENTS

PS 5500.14
10/19/2012
Table of Contents, Page iii

CHAPTER 7
FIREARMS AND BADGES

700  DEFINITIONS
701  CARRYING OF FIREARMS
702  USE OF FIREARMS
703  ARMED ESCORT BY COMMERCIAL AVIATION
704  REPORTING REQUIREMENTS
705  IDENTIFICATION BADGES
706  NON-DISCLOSURE OF BUREAU STAFF NAMES IN SHOOTING INCIDENTS

CHAPTER 8
GUARD SERVICE AT LOCAL MEDICAL FACILITIES

800  RESPONSIBILITIES
801  SUPERVISION REQUIREMENTS
802  CONTRACTOR ELIGIBILITY
803  CONTRACT REQUIREMENTS

PS 5500.14
10/19/2012
Chapter 1, Page 1

CHAPTER 1
MANAGEMENT OF CORRECTIONAL SERVICES

100.  COMPUTING THE CORRECTIONAL COMPLEMENT.  A total of 364 days
is used as a base year for a 7-day post.  A 5-day post is 260
days.  These figures are determined by multiplying the number of
days per week a post is manned, i.e., 7-day post, 5-day post, 3-
day post, and etc., by the amount of weeks in a year (52).  After
determining the total number of each post in an institution (7-
day post, 5-day post, and etc.), each total is multiplied by the
appropriate base year figures (see examples below).

In order to allow for training and annual/sick leave, a position
is calculated at 210 days per year.  The subtotal (man days) is
divided by 210.  The result is the number of positions required
to staff the Correctional Services Department.

Example:  50 (total number of 7 Day Posts) x 364 = 18,200
`
          20 (total number of 5 Day Posts) x 260 =  5,200

          10 (total number of 3 Day Posts) x 156 =  1,560
                             Subtotal: 24,960 (total man days)

     24,960 divided 210 = 118 positions plus 180 man days, which
     equals 119 positions.  A remainder of 72 or more is one
     additional position.

To determine the authorized correctional complement for a
particular Bureau institution, the following definitions and
calculations should be clearly understood:

  1.  Post.  A post is the location or assignment that is
actually worked by a staff member.

  2.  Position.  A position is the actual person or persons
necessary to work a given post.

101.  QUARTERLY AND DAILY ROSTER ASSIGNMENT.  A quarterly
assignment roster will be prepared at 13-week intervals,
corresponding with annual evaluation periods.  At institutions
which confines both males and females inmates, at least one male
and one female staff must be on duty each shift.  This
requirement is not limited to correctional officers only.  For
instances, the presence of case managers, counselors, physician
assistants, etc. will fulfill this requirement.

1.  Rotation Policy.  Correctional Officers are subject to post rotation in accordance with the negotiated agreement.

Lieutenants will be rotated two weeks prior to the regular assignment roster's effective date.

Probationary officers will be rotated monthly. In accordance with the Master Agreement, probationary staff may work non-probationary posts on overtime or on an as needed basis based on specific needs of the institution.

2.  Rosters.  When possible, post titles on the quarterly and daily rosters must reflect the duties the officer actually performs.  If an assignment's duties are widely varied, the post can be named to identify the major duties involved, with all duties identified in the post orders.

Lieutenants are responsible for ensuring the daily roster is accurate.  Pen/pencil markings or other alterations to the daily and quarterly rosters are prohibited.

The Computerized Correctional Services Roster Program is the only program authorized for the production of Quarterly Rosters, Daily Rosters, Assignment Cards, etc.

3.  The local union president or his/her designee will be provided read-only access (including the ability to print) to the Correctional Services Roster Program.

102.  OFFICER ASSIGNMENT RECORD.  An Assignment Record will be maintained on each officer, including probationary officers.  The following information will be entered in chronological order at the top of the form:

1.  Full Name

2.  Date of Entry on Duty

3.  Current Grade

Any reason for deviation from normal rotation will be noted after the assignment entry, i.e., job related, self-improvement or limited assignment for health reasons.  For those staff unable to complete the rotation, documentation on the assignment record will reflect the reason for non-rotation.

103.  PREPARATION, USE, AND DISTRIBUTION OF POST ORDERS.

Post Orders must be based on Bureau and institution policies, and
must state each post's duty hours.

Post Orders must be prepared under the Captain's supervision and
direction.  The Captain will sign and date the last page of each
section, and initial and date subsequent page changes.  A Post
Order Master File will be maintained in the Lieutenant's office
for availability to all staff.  When a new or different
assignment is know sufficiently in advance each staff member may
request a reasonable amount of duty time to read the post orders.
Ideally, this should take place prior to or immediately upon
assuming such a post (if the nature of the post permits it).

There are occasions when there is no opportunity to read the post
orders.  In these cases, it is the responsibility of the employee
to inform the employer of the fact they have not been able or
afforded the opportunity to read such orders.  The employer will
then advise the employee of the general requirements of the post,
and answer any questions.  Employees assuming posts under these
circumstances still have the responsibility of exercising sound
correctional judgment based upon their training and experience
and will make reasonable efforts to read the post orders as soon
as practicable.

After reading the post orders, the employee must sign and date
the Post Order Review Sheet (Attachment E) which is located in
Section 5 of the document.  This may be accomplished in one of
two places, either the Lieutenant's office or on the site post.

Programs Statements, Operation Memorandums, and other
instructions will be made available.

Each Post Order will contain instructions regarding the immediate
action staff should take in an emergency particular to the
particular post or location of the post they occupy.  These
"first responder" instructions should contain specific action
steps including, but not limited to, containment, staff
protective considerations, and emergency reporting protocols.
Particular requirements regarding assaultive inmates, suicides,
fires, evacuation routes,  and other "immediate" response
emergency situations should be addressed.  These instructions
should be consistent with the corresponding Emergency Plan.

In accordance with their position descriptions, staff will review
Post Orders of their assigned posts.

1.  Housing Unit Post Orders.  The Captain and Unit Manager will review and sign jointly all Post Orders (and subsequent changes) for housing units under a Unit Manager's supervision. While post orders are an assignment of work, there may be post order changes that effect conditions of employment which may warrant bargaining over procedures and appropriate arrangements.

Housing Unit Post Orders will direct the assigned staff member to maintain a unit log of pertinent information regarding inmate activity.

The Post Orders must reiterate to staff that inmates do not have any authority over other inmates.  The Post Orders must state clearly that staff are responsible for supervising inmates.

2.  Format of Post Orders.  Post Orders will describe all procedures and any special instructions regarding a specific post.  Post Orders are to contain five separate sections in the following order:

    Section 1 -- Activities listed chronologically with responsibilities clearly defined.

    Section 2 -- Special instructions relating to the specific post.

    Note:    Post Orders for armed posts, and posts which control access to the institution perimeter, must contain a statement to the effect that any employee taken hostage is without any authority, regardless of rank or position.  Additionally, specific instructions for helicopter escape attempts must be included in Post Orders for armed posts.

    Note:    Also, the Program Statement on Firearms and Badges will be included in Section 4 of the post orders.

Institutions with armed posts, the Post Orders must contain specific instructions for:

    (1)  The proper care and safe handling of firearms.

    (2)  When use of firearms is authorized.

    Note:    Post Orders must specifically allow staff to return fire when fired upon first.

PS 5500.14
10/19/2012
Chapter 1, Page 5

Section 3:  General Post Orders - applicable to all posts.

Section 4:  List of Program Statements and Institution
Supplements relevant to the post.

Section 5:  Employee Signature sheet.

3.  Maintenance of Post Orders

a.  Post Orders will be kept current.  All changes will be
incorporated into the post orders upon approval by the Captain.

b.  Post Orders and log books are confidential documents and
should never be left unattended or in an area accessible to
inmates.

Post Orders must be secured at all times when not in use by
staff.

c.  The Captain will maintain historical files and copies of
backup disks of post orders (see Attachment A for retention
instructions).

d.  Regional Correctional Services Administrators are to
review the Post Orders during staff assist visits.

4.  Armed and Perimeter Access Post Assignments.  Officers
assigned to armed posts must qualify with the firearms assigned
to that post prior to post assignment.

Except for emergencies, or as authorized by the Warden, armed
employees are assigned only to towers, mobile patrols, or other
positions inaccessible to inmates.

Post Orders should also contain specific guidelines of
personnel entering/exiting the front entrance and rear gate.

104.  OPERATIONAL REVIEW OF CORRECTIONAL SERVICES.  Refer to the
Program Statement on Management Control and Program Review,
Chapter 2, Operational Reviews.

The Captain will develop and maintain a quarterly perpetual audit
schedule.  Reviews should be based on identified trends and the
needs of the institution.  A system of correcting identified
deficiencies will be implemented.

105.  LIEUTENANTS' MEETINGS.  A Lieutenants' meeting will be held
monthly to discuss programs and problem areas of general concern.

- Missing tools will be discussed at this meeting.

- Lieutenants in attendance will be listed in the minutes.

- A recorder will be assigned to compose the minutes.

- The minutes will be submitted to the Correctional Services Administrator, Regional Office, monthly.

At a closed meeting, either before or after the formal meeting, the Captain and Lieutenants will review the progress and evaluate each probationary officer's performance.

106.   INTELLIGENCE BRIEFINGS.  In an effort to enhance communications, intelligence briefings will be conducted with institution executive staff.  Standard topics should include updates on all active investigations, serious incidents (i.e., fires, fights, assaults, homicides, etc.), subpoenas/FOIA requests, phone/mail abuse, urine surveillance, alcohol testing, security threat groups, inmate housing, work details, etc..

Each institution will develop a system to pass on appropriate intelligence to staff.

107.   UNIFORM REGULATIONS.  Uniforms will be worn in accordance with the uniform policy and Master Agreement.

Staff will not carry on their person potentially hazardous items, such as pocket knives, large amounts of cash, chemical agents, utility tools (leatherman), personal pagers, personal handcuff and key, cellular telephones, personal computers, etc.

CHAPTER 2
TOOL AND HAZARDOUS MATERIALS

200.  RESPONSIBILITIES

  1.  Each institution is responsible for developing an
Institutional Supplement outlining tool control procedures and
inspection system.  Department heads will be responsible for
implementing this procedure in their departments.

   2.  The following paragraphs describe the fundamentals of good
tool control.  This outline is flexible enough to be adaptable in
all institutions, but is expected to be defined clearly in the
Institution Supplement.

  Each institution will designate, or by selection to a permanent
position, a staff member as the Tool Control Officer.  This staff
member will insure the tool inventories and procedures are
completed.

201.  TOOL CLASSIFICATION

  1.  All tools will be classified under three general headings:

* Dangerous (Class AA)

* Hazardous (Class A)

* Non-hazardous (Class B)

  The Class AA group includes those tools deemed too dangerous to
institutional security for an inmate ever to handle without
constant, visual staff supervision.  These tools must be secured
in a manner which deny inmates even the remotest possibility of
access.

  This classification is for all security level institutions,
except for independent or satellite camps, and outside work
details, as long as the tools do not come within 25 feet of the
institution's outer fence or secure perimeter.

   a.  Class AA tools must be removed from the institution at
the end of each work day, or stored in a combination locked safe
in a Class A tool room, the Armory, or turned into the Control
Center.

   Class AA tools are identified as:

      (1)  Metal Cutting Blades.

    (2)  Bolt Cutters.

    (3)  Ramset Gun and ammunition (stored in Armory only).

    (4)  Any Diamond Tipped Tool.

  b.  Explosive and flammable compressed gas tanks (except medical oxygen) inside the perimeter must be severely limited. At the end of each workday all such tanks will be removed from the secure perimeter and secured in an appropriate lockable storage.  These tanks must be secured while inside the secure perimeter of the institution while in use.

The Class A group includes those tools:

- most likely to be used in an escape or escape attempt,
- used to manufacture or serve as weapons capable of doing serious bodily harm;
- as being hazardous to institutional security or personal safety;
- mixing chambers; or
- core drill bits.

The Class B group includes tools of non-hazardous nature.

  2.  Each institution must include in its Institution Supplement a separate Class AA, Class A and Class B alphabetical classification list of all tools, by description and size, currently in use at that institution.

Lists that give examples of tools in use are not sufficient.

  a.  The tool list will be included in the Institution Supplement as an attachment.  The tool list attachment should be reviewed quarterly and updated as needed.

  b.  Tools that are a part of a set or  sized sequentially by standard increments can be in a single listing.  For example:

| | | |
|---|---|---|
| Drill bits, metal/wood | 1/32" - ½" | amount of pieces |
| Drill bits, metal/wood | 7/16" - 7/8" | amount of pieces |
| Wrench, comb. box/open end | 1/4"  - 7/16" | amount of pieces |
| Wrench, comb. box/open end | 7/16" - 7/8" | amount of pieces |

  For instance, the institution has a combination box/open end wrench, size 1 7/8", and there are no smaller or larger sizes, the wrench will be a single listing.

PS 5500.14
10/19/2012
Chapter 2, Page 3

202.  TOOL IDENTIFICATION

1.  The Tool Control Officer must mark the tools (steel or shank portion of the tool) in each work location with an identification symbol which identifies the storage area of the tool when not in use.

2.  Tools which cannot be marked without damage, such as surgical instruments, micrometers and small drill bits, are inventoried and kept in locked storage areas when not in use.

203. STORAGE IN WORK AREAS

1.  A shadow board is considered the best method of storing all tools which can be mounted.

- All shadow boards will have white backgrounds.
- Class AA tool will be shadowed in bright (curb) yellow.
- Class A tools will be shadowed in red
- Class B tools will be shadowed in black.

Only one tool will be kept on each shadow.  The shadow must be identical in size and shape of the tool.

- Tools not adaptable to a shadow board must be kept in a locked drawer or cabinet and inventoried accordingly.

Hospital "sterile packs" will have a predetermined inventory per package and must be processed by a staff member.  The packs will only be opened when there is suspicion or evidence an instrument is missing from the pack(s).

A hospital staff member must be contacted or present if a sterile pack requires opening for security reasons.  Sterile packs as well as extra instruments must be stored under lock and key at all times.  Extra instruments will be bin carded.

2.  Any Class A tool, whether in a central tool room or work area, must be stored in a metal cage or Class I concrete walled room.

These tools must be physically separated from Class B tools, behind two locked doors.

PS 5500.14
10/19/2012
Chapter 2, Page 4

When the Class A tool room is inside the Class B tool room, the lock on the Class B tool room door serves as one of the two required locks for the Class A tool room.

3.  When a tool is removed from the inventory, the corresponding shadow will be removed immediately from the shadow board.

4.  Detail Supervisors will ensure that all tools are accounted for prior to the end of any work period (lunch breaks, workday). At the Captain's discretion tools may be returned at those times to their storage site.

204.  TOOL INVENTORIES

1.  Tool inventories will be numbered and posted conspicuously on all corresponding shadow boards, tool boxes, and tool kits. The Master Inventories will be maintained by the Tool Control Officer.

2.  All tools will be received in the appropriate warehouse unless the warehouse is located within the institution's secure perimeter.

- If the warehouse is located within the secure perimeter, other procedures will be developed, for instance, tools may be stored at the rear sallyport until properly receipted.

These tools will be picked up and receipted by the Tool Control Officer.  Tools such as bandsaw blades, files, and all Class AA tools, will be turned over immediately to the Tool Control Officer for secure storage.

Tools purchased with a credit card will be delivered to the Tool Room Officer for proper classification, marking, and placement on the appropriate inventories.

Credit card and purchase orders will be routed to the tool room officer for accountability purposes.

Institution Supplements must have defined specific procedures on using the Government-wide Credit Card Program for purchasing tools.

3.  Tools will not be manufactured at the institution without the Captain's prior approval.

4.  An annual inventory of all tools currently in use in the institution will be conducted each year during the month of January.

- The Tool Inventory Form (BP-219) is the only document authorized for this review.

a.  Employees responsible for tools in their areas and the Tool Control Officer will conduct the annual inventories and certify accuracy.

b.  Each Department Head will approve the inventories for their areas.

5.  Quarterly reviews will be conducted during the months of April, July, and October.  During the verification process, inventories, tools, and shadow broads will be inspected to ensure compliance with policy.

a.  The employee who is responsible for tools in each area will conduct the reviews and verify the inspection, including the inventory's accuracy, by initialing the Master Tool Inventory form in the appropriate quarterly column.  It is not necessary for the employee to sign every blank on the form to indicate his/her verification of these tools.

b.  The Supervisory staff from each department will monitor the quarterly tool reviews.  The supervisory staff will sign the bottom of the Master Inventory form certifying the quarterly review was conducted and the inventory is accurate.

Although all tool inventories must be accurate, only the Master Tool Inventories (maintained by the Tool Control Officer) require the signatures and initials of responsible staff denoting the quarterly inspections/reviews were conducted according to policy.

6.  The Tool Control Officer will maintain a separate file folder for each shop or area in which tools are stored.  The left side of the folder will contain the master annual inventory sheet(s).

When a change, such as additions or deletions, is made to the master inventory, the Tool Control Officer will retype or reprint the page on which the change occurred completely and insert it in the master inventory.  The new page will also be posted on the appropriate shadow board, tool box, and/or tool kit.  All responsible parties must sign any new page which has been changed.

The Captain must approve all additions to the tool inventories.

- To add a tool, the detail supervisor/Department Head

must submit a memorandum to the Captain through the
Tool Control Officer.  The name, size, and quantity of
the tool must be identified in the memorandum.

The old page will be moved to the right side of the folder for
reference purposes.  Do not destroy these pages for the current
year.

The right side of the folder will also contain, but is not
limited to, the following documentation:

- Lost or Missing Tool Reports/Found Tool Reports
  (BP-220),
- requests for additions and deletions to inventories,
- Survey Requests and Reports,
- Storeroom Requisition Forms, and
- any other documents related to tool control procedures
  for that particular area.

When the annual inventory is completed in January, it must be
placed on the left side of the folder and the old inventory moved
to the right side.  Each folder will contain the materials for
the current year and past two years.  A divider will separate
each year of documentation.

7.  Inventory maintenance in each area with tools is the
responsibility of the detail supervisor and department head.

8.  When new tools are drawn for replacement, the old tool must
be returned to the Tool Control Officer for proper disposal or
storage or warranty replacement.  Section 207 discusses
procedures for disposing of surplus and damaged/worn tools.

9.  Tools purchased or acquired from surplus property will be
stored in the designated secure storage area.

The Tool Control Officer will maintain a perpetual inventory of
all unmarked or excess tools that have been returned to secure
storage for issue or reissue.  He or she will be the only
employee authorized to draw tools from this source.

10.  An inventory will be made of all tools and equipment
civilian contractors use while working inside the institution.
The Captain will establish appropriate controls for all items,
especially items classified as Class AA and Class A tools.

205.  ISSUING TOOLS

1.  All Class AA and Class A tools will be issued only to a
Bureau employee and must be used under that staff's constant
visual supervision.

Class A tools may be issued to contract employees under the supervision of full time Bureau staff.

Special Instructions:  All ramset-type guns and ammunition will be stored in the institution Armory.  Only a staff member may use these items.  Staff requiring use of this equipment will check the item(s) out from the Security Officer and return the items(s) to the Security Officer, including spent loads, upon completing each work day or work period.

2.  Inmates may use Class B tools under intermittent supervision.  The tools must be accounted for following each work period by the Shop Foreman or detail supervisor.

3.  A metal or plastic chit receipt will be received and/or taken for all tools issued.  When a tool is issued from a shadow board, a chit must be visible on the shadow board in the tool's space.

4.  All low security level facilities and above, are to establish procedures for the control of:

- ladders,
- extension cords,
- chains,
- ropes, and
- hoses.

Inventories will be in accordance with ladder size to facilitate inspection and handling.

All extension cords will be inventoried and have a metal identification tag attached, indicating issue number (by location) and length of the cord.  All extension cords in excess of 10 feet will be classified as Class A tools.

Each of the above items must be kept in the approved storage location when not in use.  Staff members supervising the use of a ladder or heavy equipment must possess a portable radio.

Special Restriction for High Rise MCCs, MDCs, FTCs, and FDCs:
Electrical cords hard wired to buffers, vacuums, etc., must not
exceed two feet in length.

   5.  The Captain must approve the issuance of tools from any
tool storage location for a special project for extended periods.

   When tools are issued from the Central Tool Room for a special
project for extended periods, the Tool Control Officer is
responsible for periodic on-site checks (at least once weekly) in
addition to the detail foreman's daily inspections.

206.  LOST TOOLS

   1.  When any tool is lost, regardless of the classification,
the Captain and Shift Lieutenant, and Tool Control Officer must
be notified immediately by the staff member responsible for the
tool.  The staff member responsible for the tool must complete a
Lost or Missing Tool Report (BP-220) the same day with
distribution of copies to the Captain and Lieutenant.  The Tool
Control Officer will also receive a copy of the report.

   2.  The Lieutenants' Office will maintain a file of lost tool
reports and monitor for accuracy, frequency of losses from a
particular area or shop, search efforts for lost tools, etc.

   3.  All inmates with access to the tool or who were in the area
when the tool was reported missing will be held at the location
until a thorough search has been completed.

   4.  When a lost tool is recovered, the responsible staff member
will complete a Lost or Missing Tool Report in its entirety and
distribute it to the Captain and Lieutenant with immediate
notification to the Tool Control Officer the same day the tool is
found.  If the preparation of the lost tool report will require
the affected employee to stay beyond the end of his/her shift,
the employee will be compensated.

   5.  Each institution will establish procedures for quarterly
formal evaluations of Lost or Missing Tool Reports to ensure
thorough investigations are conducted and reasonable efforts are
made to recover the tools.

   Documentation of the quarterly Lost Tool Report evaluations
will be maintained for the current and past two years in the
respective tool control folders maintained by the Tool Control
Officer.

207.  DISPOSITION OF EXCESS TOOLS

   1.  All broken or worn tools that cannot be exchanged will be

surveyed and disposed of in an appropriate and secure manner.
All surveys will be conducted within the guideline established by
the Program Statement, Property Management Manual.

   Each Institution Supplement must contain a procedural outline
for carrying out the survey process, including an established
method of destruction for all surveyed tools.

   Documentation of all surveyed tools will be maintained.
Accountability for tools scheduled for survey will be maintained
until tools are actually destroyed.  A secure storage area for
tools awaiting disposal must be designated.

   Each institution will designate one employee to be responsible
for destroying all surveyed tools.

   2.  Excess tools that are not to be surveyed will be returned
to a designated secure storage area.

   3.  To maintain tool boards at the most efficient operating
level, each department will determine which tools are seldom
used.  These tools should be returned to the Tool Control Officer
for proper disposition and/or storage.  The Tool Control Officer
will reflect the transaction on the tool inventory as mentioned
above in this Program Statement.

208.  WEAPON MANUFACTURING CONTROL.  Each institution must place
special emphasis on equipment that can be used to manufacture
weapons.

   1.  In low security level institutions and above, grinding
equipment and shear presses will only be used under direct staff
supervision.  Wherever possible, these tools and equipment will
be located in areas highly visible to staff and will be locked at
the power source, excluding lockshops and armories.  Covers with
locks will be installed to prevent access.

   When the grinder or sander is not in actual use, the covers and
power source will remain locked.  Only the number of grinders
necessary for efficient institutional operations will be
maintained; this includes hand held grinders.  Shear presses will
be made inoperative when not in use.

2.  Scrap metal/Plexiglass will be removed from the shop and
industrial areas daily or stored in a secure area until removal
at low security level institutions and above, and Administrative
institutions.

3.  In low security level institutions and above, including
Administrative institutions, metal detection devices and routine
pat searches will be used to screen inmates assigned to
industrial and mechanical areas.

209. CONTROL OF FLAMMABLE, HAZARDOUS, POISONOUS MATERIALS AND
     CHEMICALS

1.  Inventories will be maintained on all flammable, hazardous,
poisonous, and toxic materials as determined by the Occupational
Safety and Environmental Health Manual.

2.  This material will be issued only to staff.  The issuing
employee will record the:

- time,
- date,
- amount, and
- name of the employee receiving the material or item.
  Amounts returned will be re-added to the inventory.

3.  All items will be stored in a locked cabinet or in a
suitable secure storage area in the original container in
accordance with the Occupational Safety and Environmental Health
Manual.  Detail Supervisors will ensure all flammable, hazardous,
and poisonous materials are secured at the end of each work
period.

4.  Gasoline/ Diesel/Propane will be controlled in the
following manner:

a.  Fuel pumps will be located outside the secure perimeter
and will be locked when not in use.

b.  The movement of fuel into the main compound for use in
small engines, such as lawn mowers and weed eaters, will be
supervised by an employee.  Additionally, equipment with fuel
powered engines requires staff supervision.  Lawn mowers must
have lockable gas caps.

c.  When not in use, fuel powered lawn mowers and other
small engine equipment will be stored in secure areas, outside
the secure perimeter.

d.  Shop and detail supervisors will issue only the amount

of fuel required to operate engines during periods of use to
staff only.  All fuel will be strictly controlled and
accountability maintained.  Fuel will be removed from inside the
secure perimeter daily.

    e.  All fuel will be stored or carried in the approved
safety can (refer to the Occupational Safety and Environmental
Health Manual).

  5.  Questions regarding the use and/or storage of flammable,
hazardous, or toxic materials will be addressed to the
institution Safety Manager.

  6.  Additional requirements are detailed in the Program
Statement, Occupational Safety and Environmental Health Manual.

210.  CONTROL OF DANGEROUS DRUGS AND HYPODERMIC APPARATUS

  Responsibility.  Narcotics, dangerous drugs, and equipment will
be controlled under provisions of the Health Services Manual.

211.  CONTROL OF FOOD SERVICE EQUIPMENT

  1.  A knife and tool cabinet, equipped with a shadow board and
a locking device, must be located in the Food Service Department.

  All knives and tools will be marked with an identification
symbol.  Inventories will be in compliance with Section 204 of
this Manual.

  2.  All tools will be issued by using the chit system.  Sign-
out sheets will be used for issuing knives.

  All knives in the Food Service Department must be attached to a
metal cable and secured to a work station in a secure area.
This cable should be of significant size and strength to not be
cut by the attached knife.  Intermittent staff supervision must
be provided.  If a knife is not used in a secure area, it must be
under direct staff supervision, even if attached to a cable.  The
institution Tool Control Officer is responsible for mounting the
cable to the knives.

  3.  Yeast must be managed and dispensed only by Food Service
employees.  Once issued, yeast must be under close supervision
until it is thoroughly incorporated into the item being prepared.
Other items such as mace, nutmeg, cloves and alcohol based
flavorings also require special handling and storage.

  Yeast will be stored in a locked metal cabinet to prevent
inmate access.  An inventory record is to be maintained which
includes the following information:

- Date and quantity of issue;

- Date and quantity of receipt;

- Balance on hand; and

- Initials of employee making the entry.

CHAPTER 3
COUNTS - CENSUS CHECKS

300.  BASIC PRINCIPLES

   1.  Each institution will conduct, at a minimum, five official
inmate counts during every 24-hour period.  On weekends and
holidays an additional count will be conducted at 10:00 a.m.

   •  The daily 4:00 p.m. count and 10:00 a.m. count (on
      weekends and holidays) will be stand-up counts.

   Institutions with secure cell space are required to lock the
inmates in their cells for all official counts, unless the
inmates are on out-counts in areas such as Food Service,
Hospital, visiting room, etc.

   2.  The master count will be maintained in the Control Center.
The Control Center Officer will be notified of any changes in an
inmate's status, such as housing unit and job assignments,
admission to hospital, etc.  The official count will be readily
available on the Master Count Sheet or in SENTRY.

   3.  Each count will be conducted with at least two officers.
There will be no inmate movement during an official count.  The
count process will not be interrupted under any circumstances,
other than by an emergency.  Exceptions to the no inmate movement
must be when inmates are in the wrong place for a count and have
to be moved by direct staff escort to their proper place of
count.

   Staff must not be distracted during the count.

   One staff member will count while the second staff member
stands in a position to observe inmate movement.  When the first
staff member completes the count, the staff member will change
positions.  The second staff member will conduct the count while
the other staff member observes the inmates.  If the staff
members count totals do not match, a recount will be conducted in
the same manner.  Two staff members may count simultaneously (one
behind the other) if a third staff member is available to observe
inmate movement or all cells are secure before the count begins.

   If the totals do not match after the second count, the
Operations Lieutenant will be notified via the Control Center.
The Operations Lieutenant will dispatch a third officer/staff
member to the location to assist with the count.  The third

officer/staff member will observe the inmates while the other staff members conduct a double count.

4.  Staff will not conduct a count based upon movements, sounds, or configurations from a covered bed.

Staff will ensure they are positively observing human flesh before counting any inmate.

5.  The staff members conducting a specific unit count will not leave the unit until the Control Center accepts that particular unit count.

6.  When counting at night, a flashlight must be used judiciously; however, enough light will be shown on the inmate to leave no doubt the officer is counting human flesh.

301.   OFFICIAL COUNTS

1.  The official count is to be taken at specific times during each 24-hour period.

2.  "Out counts" will be kept to a minimum.  All "out counts" of more than five inmates must be counted by two staff members using detail cards or inmate identification cards for identification.  Out counts will not be prepared by inmates.

The detail supervisor will sign his/her "out count" sheets prior to submission to the Operations Lieutenant.  The Operations Lieutenant will sign and approve the "out count" prior to submission to the Control Center for the official counts.

3.  At MCCs, FDCs and MDCs, where there is continuous inmate movement in and out of the institution, ISM staff will provide an out-count of inmates who are presently out of the institution during counts.

ISM staff will provide a count slip, signed by two staff members, verifying ISM has documentation that the inmates are in other law enforcement officials' custody.

4.  Each count must be reported verbally to the Control Center for verification.  If the count does not match the Master Count in the Control Center, the reporting staff members must recount when the Operations Lieutenant is notified by the Control Center.

If the second count does not match the Control Center's count, the Operation Lieutenant will order a bed-book (picture card) count.  This count requires that each inmate is counted by identifying the inmate using the bed book picture card.  At the completion of this count, any discrepancy will be identified.

The official count will not be cleared until all count slips are received and verified in the Control Center.

5.  A Lieutenant will take at least one count on the morning and evening shifts.

6.  Count slips, out count sheets, and official count sheets must be prepared in ink and retained for 30 days.  The count must have the names (printed and signed) of both officers (staff) who conducted the count.

- Altered/illegible count slips are not acceptable.

302.  EMERGENCY COUNTS

1.  This is an official count taken at times other than that specified for a regular official count.  The Captain will authorize emergency counts during weekday operations.  During evening, morning, and weekend operation, this authority is delegated to the Operations Lieutenant.

2.  When perimeter visibility is limited by fog, power failures, or for any other reason, it is necessary to count at more frequent intervals than the regularly scheduled official counts.

303.  OFFICIAL COUNT FORM.  All official counts are to be recorded on the SENTRY generated form.  If SENTRY is unavailable, or time does not permit the entering of all out counts, the Official Count form (Attachment B) will be used.

The format will not be altered; although, the size may be increased to provide space for additional units or "out-counts."

304.  CENSUS CHECKS.  To ensure effective accountability of inmates, census checks must be conducted at all institutions. Census checks identify inmates in unauthorized and unassigned areas.

- This check is not an official or total head count.

1.  Census Checks.  All Departments must conduct a census of all inmates assigned to their area during each work period (AM and PM).  It is each department's responsibility to document the results of each census check; for example, AM census check completed at 8:40 a.m. with no discrepancies, PM census check completed at 8:40 p.m. with one inmate out of bounds. Discrepancies and action taken must be listed.

Institutions will set guidelines and procedures for conducting the census check in an Institution Supplement.

2.  Detail Accountability Checks.  Lieutenants will conduct accountability checks for all work details each month.  To ensure compliance with this requirement, 25% of all inmate details will be checked each week.

These checks are conducted to identify inmates in unauthorized areas, and to determine the presence and accuracy of detail cards (crew kit cards).  Discrepancies will be immediately corrected. These checks are in addition to the AM/PM census checks the detail supervisors/foremen conduct.

a.  Accountability checks will be conducted randomly throughout the month at various times with no prior notification.

b.  The Captain's office must maintain documentation of all detail accountability checks for 30 days.

3.  Lockdown Accountability Checks.  Each institution will conduct a monthly institution accountability check.  The purpose of this accountability is to identify inmates in unauthorized areas throughout the institution - not to obtain a total head count.

a.  The accountability check will be announced at a random time and date with no prior notification.

b.  Upon hearing the announcement of a lockdown accountability check, staff must secure all entrances and exits in their area, stop all inmate movement, and must survey their area of responsibility to account for and verify inmates authorized/unauthorized to be in the area.

Staff will identify inmates assigned to the detail or area who cannot be accounted for during the accountability check.  The Lockdown Census forms must be completed on all accountability checks (Attachment D), which includes:

(1)  Names and register numbers of inmates found in unauthorized areas and

(2)  Names and register numbers of inmates assigned to the detail who cannot be accounted for.

305.  CONTROL CENTER RECORDS.  Picture cards of all inmates assigned to the institution will be on file in the Control Center.  Control Center records must accurately document:

- Custody;
- Sentence information (MCC/MDC exempt); and
- Other necessary security and control information.

306.  DAILY CHANGE/TRANSFER SHEET.  A SENTRY generated list which denotes changes in an inmate's status must be published each regular work day.

The list includes:

- Housing unit assignment;
- Job assignment; and
- Medical idle or convalescence which exceeds one day.

A copy of this document must be available to staff who supervise inmate details and each employee responsible for preparing the list of changes.

Inmates will not be involved in the process or publication of the change/transfer list.

307.  INMATE CALL-OUTS.  The call-out sheet lists time and location for inmates who have scheduled appointments with staff, i.e., medical, dental, educational, etc.  This information will be made available to all concerned staff and posted in the inmate housing units.

Special precautions must be established to ensure that inmates are unable to circumvent the procedures or make additions and deletions which undermine the accountability system.  The employee who places an inmate on call-out must ensure the requested inmate arrives at the allotted time.

If an inmate does not arrive at the prescribed time, the requesting staff member must contact the staff responsible for the inmate's accountability.  If efforts to locate the inmate fail, the inmate must be reported to a lieutenant immediately as missing and appropriate actions will be initiated to locate the inmate.

308.  PASS SYSTEM.  All institutions that adopt a pass system must implement the following elements to ensure the program is not compromised.

- Establish a method of daily accountability for all passes issued each work day.

- Identify an employee to check each issued pass against the stub or copy remaining in the pass book.

- Maintain a log to document discrepancies.

- Develop a system of reporting pass system discrepancies to the Lieutenant's Office.

- Implement a follow-up system by the Lieutenant's Office which includes written notification to the responsible employee with copies submitted to the Captain and responsible employee's department head.

- Departments with noted discrepancies must submit a report of action denoting steps taken to correct discrepancies to the Lieutenant's Office.

- Frequent discrepancies within the same department must be reported to the respective Associate Warden.

Follow-ups and accountability for each pass are key elements in any effective pass system.

309.  DETAIL/CREW KIT CARDS.  Control Room Officers must ensure each crew kit has current detail cards on all inmates assigned to the detail.  At a minimum, crew kit cards must provide:

- Names of the inmates;
- Register number;
- Current photo (a new photo must be made whenever an inmate's appearance changes);
- Job assignment;
- Quarters assignment;
- Custody level; and
- Any special conditions.

Detail supervisors will be responsible for inmates whose cards are included in the respective crew kits and the accountability of the crew kits when checked out from Control Center.

Inmates will never be allowed to handle detail/crew kits and/or the cards assigned to the kits.

PS 5500.14
10/19/2012
Chapter 3, Page 7

310.  SPECIAL ACCOUNTABILITY.  A staff member must observe all
inmates confined in continuous locked down status, such as
administrative detention or disciplinary segregation, at least
once in the first 30 minute period of the hour (example, 12:00
a.m. - 12:30 a.m.) followed by another round in the second 30
minute period of the same hour (example, 12:30 a.m. – 1:00
a.m.), thus ensuring an inmate is observed at least twice per
hour.  These rounds are to be conducted on an irregular
schedule and no more than 40 minutes apart.  All observations
must be documented.

Closer observation may be required for an inmate who is mentally
ill, or who demonstrates unusual or bizarre behavior.

For specific instructions and guidance for the supervision and
monitoring of suicidal inmates refer to the following Program
Statements.

- Health Services Manual
- Suicide Prevention

CHAPTER 4
EMERGENCY ASSISTANCE TO NON-FEDERAL CORRECTIONAL SYSTEMS

400.  BACKGROUND.  The Bureau of Prisons, on occasion, may be
requested by other Federal, State, or local agencies to provide
supportive assistance.  Additionally, the Bureau may have
occasion to request assistance from these agencies.

Bureau assistance will be considered based on the Bureau's
statutory authority and expertise in the requested area and/or
the requesting Federal agency's authority to empower the Bureau
(e.g., deputize) to provide the assistance.

With respect to non-Federal entities, Federal and state
governments often enter into contractual agreements where one or
the other houses inmates from outside its system
(18 U.S.C. § 5003).  Similarly, the Bureau "lends" its Executives
to various State systems temporarily through the
Intergovernmental Personnel Act of 1970 (42 U.S.C. § 4721).

Through its own statutory mandate and  the National Institute of
Corrections, the Bureau provides assistance to non-Federal
entities (18 U.S.C. §§ 4042, 4352).  Additionally, the Emergency
Federal Law Enforcement Assistance Program (28 CFR 65) provides
for Federal assistance to States in emergencies, upon the
Attorney General's approval.

401.  DEFINITION.  For this Program Statement's purposes, the
following definition applies:

  Law Enforcement Emergency is an uncommon situation which
requires law enforcement, which is or threatens to become of
serious or epidemic proportions, and with respect to which State
and local resources are inadequate to protect the lives and
property of citizens or to enforce the criminal law.

402.  MEMORANDUM OF UNDERSTANDING (MOU).  Ordinarily, direct
emergency assistance to non-Federal correctional systems is
limited to those systems with which the Bureau has an MOU.  All
such MOUs must be made available to the employees.  These MOUs
may be stored with the contingency plans.

A MOU, entered into with local, county and State correctional
entities, is to address the issue of State, as well as Federal,
assistance.

PS 5500.14
10/19/2012
Chapter 4, Page 2

Absent an MOU, ordinarily, the Bureau will not provide emergency
law enforcement assistance to non-Federal correctional entities.
An exception to this policy may be made when the non-Federal
correctional entity has exhausted its available resources,
available resources are inadequate to protect the lives and
property of citizens, and the required assistance (e.g., by the
State or other localities) cannot be obtained elsewhere in a
timely fashion.  In such instances, the Bureau may provide
emergency supportive assistance as set forth in this Chapter.

In general, the types of assistance that may be provided without
an existing MOU should correlate to the typical modes of
assistance set forth in Section 404 of this Chapter.

An MOU's intent is to provide an avenue for an institution to
respond expediently and proficiently to various types of
emergency situations by developing authorization procedures for
basic Federal assistance at the local level, while allowing for
even greater assistance, if deemed necessary, with higher level
approval.

   a.  Scope.  Bureau institutions, as set forth in the
Correctional Services Manual, have included State, county, and
local resources in their institution contingency planning and
overall emergency preparedness plans.

   These plans may include agreements with local non-Federal
agencies for specific assistance.  In keeping with such
interagency cooperative arrangements, the Bureau may provide
similar emergency assistance to non-Federal correctional
entities.

   The scope of such assistance must be established in an MOU
entered into by the institution's Warden and authorized non-
Federal correctional entity.

   b.  Preparation.  Each institution Warden may prepare an MOU
when it is determined to be appropriate.  Factors to consider in
making this determination include, but not limited to, the type
and number of non-Federal correctional systems within the
immediate area and availability of non-Federal resources to meet
the needs of non-Federal law enforcement during an emergency.

   The MOU's purpose is to anticipate possible emergencies and
detail in advance the type of assistance the institution would
provide if requested.

The MOU must specify whom in the non-Federal correctional entity is authorized to make such a request and the local institution's limits on authorizing various degrees of assistance.

c.  Requests for Assistance.  Ordinarily, an outside request for assistance should come from a high-level State authority and be approved only by the institution's Warden or Acting Warden, in consultation with the Regional Director.

The MOU must state that approval by the appropriate Regional Director is required prior to providing assistance.  A copy of the MOU must be forwarded to the Assistant Director, Correctional Programs Division, Central Office.

When advance approval from the Regional Director is not practical, the Regional Director and Assistant Director, Correctional Programs Division, Central Office, must be notified as soon as possible of the type of assistance requested and any action and/or response provided by the institution.

The MOU must contain a statement that Bureau staff may not use weapons, ammunition, or chemical agents to provide assistance, except as authorized by the Deputy Attorney General or Director of the Federal Bureau of Prisons in extraordinary circumstances (for further discussion on this point see Section 404.d.).

d.  MOU Preparation Guidelines.  The following guidelines must be considered in any MOU.

(1)  The assistance required must be immediate, short-term, and limited to operations which Bureau staff are authorized to provide, and for which they are trained and have expertise, such as detention, perimeter security, and transportation of persons duly detained by the non-Federal authority.

(2)  The MOU must provide for financial reimbursement of resources expended (including personnel employed beyond the initial response time) and/or damages.

(3)  Bureau assistance may not extend into operations such as crowd control for general public safety projects or for enforcing laws associated with scheduled public events.  The basis for this limitation is the Bureau's statutory boundaries limiting its scope of expertise to correctional management issues.

   (4)   Ordinarily, Bureau staff are not expected to become
involved in any situation requiring the use of force.  When a
particular situation necessitates the use of force (e.g., for
self protection), the application of force must not exceed the
amount of force specified by the Bureau's policies.


403.   REVIEW BY/NOTIFICATION OF REGIONAL DIRECTOR

   a.   Review.   While the Warden is the signatory authority for an
MOU, in every instance the MOU's prior review and approval by the
respective Regional Counsel and Regional Director is required.
In conducting this review, the Regional Counsel will consider the
provisions of applicable State law.

   b.   Notification.  Even in instances when prior approval by a
Regional Director is not required for some action under the MOU,
the Warden (or designee such as Duty Officer) must, as soon as
practical, provide the Regional Director (or designee such as
Regional Duty Officer) with a detailed description of any
assistance provided.

404.   TYPICAL ASSISTANCE AND GUIDELINES.  The following typical
types of assistance may be considered for inclusion in an MOU.

   a.   Emergency Transportation.  Bureau (secure) buses,
ambulances, and vans, driven by trained Bureau staff, may be used
to transport prisoners who are in a State or county correctional
entity's custody.

   The agency must provide sufficient staff on board to maintain
security and good order.

   In this situation, the Bureau is not considered to have assumed
custody of the inmates.

   b.   Detention.  The Bureau may take into custody detention
inmates being held for trial or convicted of criminal offenses in
the State courts and who are duly detained by the State
correctional entity.

   Such prisoners may be accepted for detention on a Bureau bus
(to expedite transportation to another facility) or in a Bureau
institution.  Detention on a bus differs from simply providing
transportation in that the prisoner is actually transferred into
temporary Bureau custody and is subsequently supervised by Bureau
staff.

Such transfer of prisoners into Bureau custody requires the existence of a contract which allows the Bureau to assume the offenders' custody (see 18 U.S.C. § 5003).

It is suggested that the MOU incorporate, to the extent practicable, the relevant provisions of the aforementioned statute.  When feasible, a contract should be considered as an appendix to the MOU which addresses the placement of any individual in a Bureau institution temporarily.

Absent such a contract, the Bureau will not assume custody of State inmates without the appropriate Regional Director's prior approval.

c.  Logistical Support.  The Bureau may provide emergency supplies such as blankets, clothing, food, and similar items if necessary to protect the health and safety of others.

Clothing marked with the Bureau insignia may not be lent to, or worn by, any non-Bureau employee.

Equipment, such as fire trucks, vehicles, machinery, and generators may be provided but ordinarily must be operated by Bureau staff.  Non-Bureau staff may operate Bureau equipment only when the non-Federal correctional authority has acknowledged that its staff is competent to use such equipment.

The use of Bureau equipment will be provided only until the emergency situation is controlled, and public safety is no longer endangered.

d.  Weapons, Ammunition, and Chemical Agents.  The Bureau may provide these items to the non-Federal correctional entity when the non-Federal correctional authority has indicated that its staff are competent to use such weapons, ammunition, and chemical agents.  This information is to be specified within the MOU.

Absent an MOU, weapons, ammunition, and chemical agents may be provided only with prior approval of the Assistant Director, Correctional Programs Division, Central Office.  Bureau staff will not use weapons, ammunition, or chemical agents to provide assistance to non-Federal correctional entities.

If a non-Federal correctional entity requests Bureau staff to use weapons, ammunition, or chemical agents in response to a specific emergency, Bureau staff will do so only with the approval of the Deputy Attorney General, unless the Director of the Bureau of Prisons personally concludes that the delay to obtain approval would likely result in death or serious bodily injury to employees or inmate hostages (non-Federal correctional entities and Bureau).

The Director, under the aforementioned circumstances, may authorize the use of such devices and subsequently make a full report to the Deputy Attorney General as soon as possible.

e. Perimeter Security. Bureau arrest authority is limited by the provisions of 18 U.S.C. § 3050 to making arrests for Federal crimes, although the laws of some States may authorize Bureau personnel to make arrests for State crimes.

In States where Bureau personnel have this authority, the MOU may provide provisions which allow Bureau staff to perform perimeter security duties at a non-Federal institution in situations when the non-Federal staff are unable to provide perimeter coverage.

The MOU must also clearly state that "perimeter coverage" by Bureau personnel involves dealing with inmates only, not members of the public or media. Non-Federal personnel are responsible for handling the media and public during emergencies at non-Federal institutions.

In states that Bureau personnel do not have authority to make arrests for state crimes, the MOU must provide for Bureau staff to perform other functions, including routine duties inside or outside a non-Federal correctional institution, therefore, freeing non-Federal correctional staff for primary (e.g., perimeter) coverage.

f. Escape Hunts. Based on its limited arrest authority, the Bureau may not assist in searches for felony offenders who have escaped from non-Federal correctional custody. Bureau staff may, however, conduct searches on Federal penal property. In other situations, Bureau staff may assume other duties as set forth in this Chapter, thereby freeing up additional State or local correctional staff to track an escapee.

g.  Medical Support.  Bureau qualified health personnel may
provide medical support within their respective areas of health
care training or experience.  Such support may also include use
of medical equipment and supplies.

h.  Hostage Negotiation.  The Bureau may provide trained
hostage negotiators, but ordinarily, their activities are limited
to background consultations rather than direct negotiations with
inmates.  Decisions to authorize Bureau hostage negotiators to
actually conduct negotiations must be made no lower than the
Regional Director level.

i.  Food Service Support.  Bureau personnel may provide food
service support.  The support may also include the use of food
supplies and equipment.

405.  CRISIS MANAGEMENT TEAM.  The Bureau may provide trained
Crisis Management Teams to respond to non-Federal correctional
emergencies.

Prior to deploying any Crisis Management Team, the authorization
of the Attorney General of the United States is required.  The
authorization must be obtained through the respective Regional
Director, Director of the Bureau of Prisons, and Deputy Attorney
General.

406.  SUPPORT ASSISTANCE BY OTHER FEDERAL AGENCIES.  It is
possible for other components of the Federal law enforcement
community to become involved in resolving non-Federal
correctional emergencies.

When this occurs, and the Federal component has the legal
authority to deputize others, Bureau staff may be deputized. If
Bureau staff are deputized, their authority in such situations is
limited to the scope of authority exercised by the empowering
agency.

When practicable, the Assistant Director, Correctional Programs
Division, Central Office (CO), will be contacted for approval
prior to Bureau staff being deputized.  When not practicable, the
notification must occur as soon as possible.

407.  REPORTING REQUIREMENTS.  The Warden must notify the
Regional Director, Assistant Director, Correctional Programs
Division, CO, and the Director immediately of all requests for
emergency law enforcement assistance from a non-Federal
correctional entity.

If practicable, this notification is to be made prior to the
assistance being provided and, if not, as soon thereafter as
possible.

Upon receipt of this notification and in conjunction with the
approval of any request for emergency law enforcement assistance
to a non-Federal correctional entity, notification must be
provided immediately to the Deputy Attorney General.

When practicable, this notification is to occur prior to the
assistance being provided.  When this is not practicable, such
notification must occur immediately thereafter.

As soon after notification as practicable, the Warden must
document in writing the request for assistance under the MOU.
When assistance is provided, a written Report of Incident
(BP-583) must be prepared and submitted to the specified
individuals, including the President of the Council of Prison
Locals #33.  This report must provide a vivid synopsis which
includes the elements listed below.

- Nature of the emergency request that prompted the
  assistance;
- Assistance provided;
- Results (or tentative results) of the assistance;
- Expenditures;
- Any injuries sustained; and
- Other relevant information.

408.  ANNUAL REVIEW OF MEMORANDUM OF UNDERSTANDING.  The Warden
is to ensure that each MOU is reviewed annually during the month
of November, as part of the contingency plans review, to
determine continued applicability.  The result of the annual
review must be provided to the Regional Director, with a copy to
the Regional Counsel.

409.  ASSISTANCE.  Questions concerning the provisions of this
Chapter should be directed to the respective Regional Counsel and
Correctional Services Administrator.

CHAPTER 5
CANINE UNITS

500.  ADMINISTRATION.  Regional Directors, in coordination with
the Assistant Director, Correctional Programs Division, have the
authority to identify one institution in their region for
assignment of a canine unit.

A canine unit is composed of, at a minimum, one canine handler
and one dog with multiple abilities, such as tracking and
narcotics detection.

Captains have management responsibility for the canine unit.
Actual program coordination must not be delegated below the level
of a GS-11 Lieutenant.

Requests for the canine unit's assistance outside the assigned
institution must be approved in advance by the Warden or Acting
Warden.

501.  HANDLER SELECTION.  Each institution Warden with an
authorized canine unit must select one handler for each canine.
A handler must make a two-year commitment to the program and
interact positively with the canine.

The handler will work only with the dog originally assigned and
ordinarily should not be assigned collateral duties.  A secondary
handler may be assigned to feed and service the kennel area if
the primary handler is not available.

The handler must be willing to care for the canine, control the
animal, and obtain maximum productivity from the dog.  A handler
is also required to give clear commands to the canine in the
language the canine was originally trained.

The handler must be provided a clothing allowance (amount set by
policy) each year to purchase blue or gray jumpsuits and/or
suitable nickel gray uniform clothing.  Safety toe footware are
to be worn and must be provided to the handler as prescribed in
the Property Management Manual and Master Agreement.

502.  CANINE SELECTION.  The Malanois or German Shepherd is the
only canine breed authorized.

Only passive alert canines with an even temperament are to be
purchased.

PS 5500.14
10/19/2012
Chapter 5, Page 2

Any canine purchased must possess, at a minimum, a Schutzhund I or Police I title prior to purchase.  The Schutzhund or Police title rating identifies the level of training the dog has received in tracking, obedience, and handler protection.

No more than two canines per kennel are authorized.  Female canines must be spayed prior to purchase.

Any selected canine must be at least two years of age, but no older than 2½ years.  The hips, teeth, back, and shoulders must be documented as sound prior to purchase.  Additionally, a birth certificate must be provided to determine the canine's age at the time of purchase.

A German Shepherd's spine and hips must be guaranteed for a period of one year.  The Malanois canine's spine and hips must be guaranteed for two years.

503.  HANDLER RESPONSIBILITIES.  Each canine handler is responsible for the canine's care.  The proper performance of routine canine unit duties will ensure adequate care of the animal and preserve the integrity of the program.

The handler will be responsible for the canine's actions and use.

The handler must ensure a request for the canine unit's use does not violate policy and will not cause harm to the handler, the canine, or a third party.

A canine team will coordinate all narcotic activities with the institution SIS office.

Canines will never be allowed to roam freely inside an institution, on institution property, or be trained to respond to any command not learned in a training school.

During the a housing unit search, the canine will remain on a leash and inmates will be kept clear of the area.

Canine units may be used for escape hunts if approved by the Warden, but canines may not be used in use-of-force situations or for crowd control purposes.

If, due to an unforeseen or uncontrolled situation, a canine becomes involved in a use-of-force situation, proper notification must be made and documented in accordance with the Program Statement on Use-of-Force and Application of Restraints.

When the canine must be taken into a public place, a mouth muzzle must be used.  A canine may not be taken into public places unless on official duty or for medical treatment.

A handler should not leave a canine unattended in a vehicle for an extended period of time.  If circumstances dictate leaving a canine in a vehicle, the windows must be slightly open for ventilation and the circulation fan turned on.  Prolonged isolation will cause discomfort and/or injury to the canine. Leaving a canine in a vehicle, even with the windows slightly open on a hot day, may cause serious injury or death.

A vehicle equipped with a secure partition and an air circulation fan is to be available to the handler.

The handler must maintain a daily record of training and tactical operations, and medical check-ups.  These documents must be submitted to the Captain or canine unit Lieutenant for review.

All confiscated contraband will be handled in accordance with the Program Statement on Inmate Personal Property.

504.  EMPLOYEE GUIDELINES.  Employees who are not directly assigned to the canine unit will not enter any building or area that is being searched by the canine unit without the approval of the supervising Lieutenant and canine handler.  If an employee inadvertently enters an area where a canine unit is working, he or she will exit the area quietly and without hesitation.

Employees must not walk or run in front of a canine unless responding to an emergency situation.

Employees must never make aggressive gestures toward the dog or handler.  Employees must never attempt to touch, handle, or feed a canine without the handler's approval.

No one, other than the handler, will give commands to the canine.

No one, other than the handler, will attempt to enter or retrieve anything from a canine unit vehicle or kennel when the canine is present.

Employees will be notified of the above requirements at least once per year where canine units are maintained.

505.  HEALTH, CARE, AND FEEDING.  Inmates will never be allowed access to the canine or associated canine unit items such as kennel, food, bedding, and etc.  The handler will exercise the

PS 5500.14
10/19/2012
Chapter 5, Page 4

canine daily.  An obstacle course with at least four obstacles
should be constructed to maintain a high level of fitness.

The handler will ensure that the amount of daily food consumption
provides proper nutrition so the canine stays fit, agile,
muscular, and in excellent health.

Each canine will be housed in a kennel and not at the handler's
residence.  Kennels must be constructed with a chain link fence
which encloses the kennel's perimeter.  The fence will be set on
a 4 x 10 foot concrete floor.  A small canine housing area
constructed of wood or plastic will be well insulated to maintain
a comfortable temperature for the canine.

The kennel should not be elaborate or constructed to allow the
canine to become acclimated to the kennel's climate and not the
outside atmosphere.  The canine house should be located in the
middle rear of the concrete slab.

If more than one canine is maintained in the kennel, a partition
will be installed between each stall to prevent the dogs from
agitating each other.  An isolation area will be available for
the separation of sick or new canines.

The kennel area will be cleaned daily.  The individual stalls
will be cleaned and sanitized with a suitable disinfectant and
water solution.

Canine handlers are responsible for kennel sanitation.  Inmates
will never be used for this purpose.

Each canine must receive regular medical care to maintain peak
condition including, but not limited to, the following:

- Yearly immunizations for rabies, distemper, and parvo.

- Semiannual examinations by a licensed veterinarian or when
  unusual behavior is apparent as a result of illness or
  injury.

- A veterinarian approved diet and prescribed medication
  schedule (heart worm pills, vitamins, and any other
  medication as prescribed).

PS 5500.14
10/19/2012
Chapter 5, Page 5

Access to kennels must be limited to all employees except staff associated with the canine unit. A logbook is to be maintained at the kennel and all persons entering must sign in and out. The working life of a canine, under normal conditions, is eight to 10 years. After that period of time, the canine's continuation of service must be assessed.

If the canine is determined medically unfit or unhealthy, the dog may be evaluated and euthanized by a veterinarian. Handlers who wish to keep the canine, after the animal has been retired, must submit a request to the Assistant Director, Correctional Programs Division, CO.

506. TRAINING. Each canine handler must be matched and trained with the canine selected by the kennel in order to ensure peak performance. The entire selection and training process should be accomplished by a single kennel.

Canines will only be trained in narcotics detection, handler protection, and escape hunts.

Entry level training for the canine and handler must be at least 200 hours in duration. The curriculum must cover:

- Legal issues;
- Escape prevention;
- Contraband detection;
- Building searches;
- Guarding;
- Barking;
- Control and obedience exercises;
- Apprehension; and
- Handler protection.

An approved handler/canine training school must conduct an annual 24-hour recertification. The canine and handler must complete the training course successfully prior to the canine unit's use.

507. TRAINING DOCUMENTATION. The initial handler development and yearly recertification courses are mandatory. Refresher training deemed necessary for the canine and handler must be made available through the kennel that provided the canine. Training must be documented by the Captain and Employee Development.

508. PROCUREMENT. Expenditures incurred by canine units will be funded by the respective Regional Office and institution, cost centers 215 and 315. Canines must be purchased from kennels approved by the Assistant Director, Correctional Programs Division, CO.

CHAPTER 6
AFTER-ACTION REVIEW AND REPORTING

600.  DEFINITIONS

  a.  A major incident includes, but is not limited to, all:

- shooting incidents,
- major fires,
- work/food strikes,
- disturbances,
- escapes,
- internal and external hostage situations,
- homicides, and
- other incidents as identified by the respective Regional Director and Assistant Director, Correctional Programs Division, CO.

  b.  A shooting incident for the purpose of this Program Statement is defined as:

    (1)  Intentional or unintentional discharge of a firearm by an employee either on or off duty, under circumstances which warrant official notice or review.

    Weapons harmlessly discharged in connection with training or recreation are not included in this definition and, except as noted below, need not be reported.

      (a)  Discharge of a firearm by anyone during the course of official business.

      (b)  Discharge of a firearm in defense against vicious animals.

      ©)  Discharge of a firearm resulting in self-inflicted injuries or injuries to another person.

      (d)  Discharge of a firearm by a Bureau employee resulting in an investigation by any law enforcement agency.

601.  AFTER-ACTION REVIEW TEAM.  When a major incident occurs at a Bureau or contract facility, the Regional Director may, at his or her discretion, appoint an After-Action Review Team to investigate the incident and prepare an After-Action Report.

The Review Team chairperson must be from the Regional Office in
the region where the incident occurred.  Unless the Director
determines otherwise, the team will include a representative from
the Correctional Services Branch.

If the incident includes issues regarding facility design, the
Review Team must include a representative from the Administration
Division (CO).

602.  AFTER-ACTION REVIEW TEAM FOR DISCHARGE OF FIREARM

   a.  Within two working days of a shooting incident, the Warden
must submit a full report on the Report of Incident form (BP-583)
to the Regional Director, with copies to the Assistant Director,
Correctional Programs Division, and the Assistant Director,
Health Services Division.  When appropriate, medical reports
generated from the incident must be included.  If such reports
are included, the affected staff will be so advised.

   b.  For all shooting incidents at a Bureau or contract
facility, the Regional Director is to appoint an After-Action
Review Team, referred to as a "Shooting Investigation Team."

   The Regional Director determines the team's composition, based
on the specific circumstances.  Depending on the seriousness of
the incident, the Regional Director may authorize a paper review
of the facts or may require an on-site investigation.

   c.  The Shooting Investigation Team will prepare a Shooting
Incident Report which will serve as the After-Action Report.  The
report will be submitted to the Regional Director for comments
and recommendations.

603.  SHOOTING INCIDENT REVIEW COMMITTEE.  The Shooting Incident
Review Committee must review each After-Action Report including
the Regional Director's comments and recommendations to determine
if staff actions complied with established policy and make
appropriate recommendations.

The Shooting Incident Review Committee should consist of:

   • Assistant Director or Designee, Correctional Programs,
     Division (Chair),
   • Administrator, Correctional Services Branch, Correctional
     Programs Division, and
   • Associate General Counsel, Legislative & Correctional Issues
     Branch, Office of General Counsel.

A representative of the Council of Prison Locals at the appropriate level may be provided a copy of the After Action report in accordance with appropriate laws, rules, and regulations.

Based on the nature of the incident, the Deputy Attorney General may assign an attorney to the Shooting Incident Review Committee to determine the degree of the Department of Justice participation in the review.

Additionally, all After-Action Reports and summary reports are required to be compiled and forwarded to the Administrator, Correctional Services Branch Central Office, via BOPNet GroupWise.

604.   AFTER-ACTION REPORT FORMAT.  Although each report may be tailored for the specific incident, ordinarily, After-Action Reports will be in the following format.

   a.  Introduction/Executive Summary.  This section summarizes all significant information resulting from the review.  It identifies team members, purpose and scope of the review.

   This information will be presented in bullet format, i.e., persons involved, injuries, monetary damages, etc.

   b.  Chronology of Events.  This section details events sequentially.  It may be separated into a chronology of inmate-inspired events and staff responses.

   This section will not include comments or conclusions on inmate or staff activities.

   c.  Analysis of Events.  This section includes the team's analysis of all events as they unfolded.

   It may also be separated into an analysis of inmate actions and staff responses.  Comments on results or consequences of actions may be included in this section.

   d.  Other Factors.  This section should include on-site observations, current events affecting the Bureau or local area, and investigative or intelligence information.

   This section may not be necessary in all reports.

e.  Conclusions.  This section will contain a well-reasoned conclusion based on all of the above sections.  Each piece of information analyzed above must lead to conclusions.

This section will include comments on staff response and may list both positive and negative performances of individual staff members or groups of staff.

f.  Recommendations.  This section will be presented in bullet format and reflect the Analysis of Events and Conclusions sections.

This section will include any knowledge gained from the incident with recommendations for additional training and/or revisions to the existing training programs, if applicable.

g.  Attachments.  This section contains relevant photographs, memorandums, rosters, lists of staff interviews, and other documentary evidences considered during the review process.

When multiple jurisdictions are involved, copies of reports and investigations conducted by other law enforcement agencies should be included.

h.  Cost/Impact Statement.  A Cost and Impact Statement (Attachment C) must be completed as an integral part of every review.  Each monetary amount must be clearly labeled as an estimate or actual final figure.

When major portions of the impact statement are based on estimates, an amended impact statement must be filed when accurate cost/impact information is available.

605.  INMATE INVOLVEMENT.  In all cases, a list of every inmate determined to be involved in the incident and the degree of his or her involvement must be included as an attachment.  The list will provide the following information.

- Name;
- Register number;
- CIM/STG information;
- Posted picture file status;
- Hot File status;
- Group/gang affiliation (member, suspect, associate);
- Age;
- Sentence data;
- Level of involvement;
- Race;
- Home of record;
- Incident report information; and
- Status of incident report in discipline process.

Since this information is critical for future tracking of inmates involved in serious incidents, this attachment should be formatted in columns for easy retrieval.

606. SUMMARY REPORT FORMAT. From each After-Action Report, the originating office will prepare a written Summary Report of all relevant information for the authorized appropriate reviewers. Sensitive information will be only documented in the original After-Action Report, and provided to officials on a "need to know" basis.

a. Preparation. The Summary Report will be forwarded to the Administrator, Correctional Services Branch, via GroupWise. The report must include the same relevant information as the After-Action Report but may not contain names of:

- Employees;
- Local law enforcement officials; and
- Individuals in the community.

The Office of Emergency Preparedness must distribute this report to all Regional Directors, Wardens, and Correctional Services Administrators. Wardens are to review each report with Associate Wardens and Captains. The information and recommendations should be disseminated to staff to review procedures and make appropriate changes.

Should the reports result in changes to working conditions, the Union will be notified of the proposed changes so that the union has the opportunity to bargain, as required by the Master Agreement and the statute. Management at the appropriate level shall review each report with the union designee at the appropriate level. This does not include providing the Union designee with a copy of the written incident(s) at hand. If management fails to notify the union designee at the appropriate level he or she is encourage to contact the management at the appropriate level.

b. Summary Report Components. The summary should contain the following sections:

(1) Introduction. This section provides a brief description of the incident and focus on details of all events sequentially.

It may be separated into a chronology of inmate-inspired events and staff responses.

(2)  Other Factors.  This section should include current events affecting the Bureau or local area, and investigative or intelligence information.

Depending on the circumstances, it may not be necessary to include this section in all reports.

(3)  Recommendations.  This section should be presented in bullet format and should not contain any information which could compromise law enforcement activities, staff members, or individual inmates.

607.  DISCLOSURE OF BUREAU STAFF NAMES IN MAJOR INCIDENTS. Disclosure of the names of Bureau employees involved in major incidents will be in accordance with the Program Statement on News Media Contacts.

Employees who are investigated for possible misconduct as a result of an After-Action Review, and no disciplinary or adverse action will be proposed, will be notified of the decision within seven working days after the review of the investigation by the Chief Executive Officer or designee.

CHAPTER 7
FIREARMS AND BADGES

700.  DEFINITIONS.  Probable cause, reasonable determination, or
reasonable belief means facts and circumstances known to the
employee at the time of the use of firearms that would cause a
reasonable employee to conclude that the action is appropriate.

701.  CARRYING OF FIREARMS.  Title 18 U.S.C. § 3050, authorizes
the Attorney General to prescribe rules and regulations relating
to the carrying of firearms by Bureau officers and employees.
This authority is delegated to the Director in 28 CFR 0.96(o).

When approved by the Warden, institution staff are permitted to
carry firearms when:

- transporting inmates,
- assigned to escape posts, and
- assigned to security posts which require firearms as
  standard issued equipment.

Carrying or the use of personal or privately owned firearms while
on duty is prohibited.

Post orders, riot plans, and escape plans will include
instructions for carrying firearms.

   a.  Duty Assignment.  Employees must not be assigned to duties
that require the carrying of firearms prior to successfully
completing the firearms familiarization training course.

   b.  Staff Qualification.  New employees must not be assigned to
posts requiring the carrying of firearms before completing the
Introduction to Correctional Techniques Training at the Federal
Law Enforcement Training Center.

   In extraordinary circumstances, an exception may be made for an
employee who has completed the local firearms familiarization
training with written approval of the Warden and Regional
Director.

   c.  Re-qualification.  Staff must complete satisfactorily the
Bureau's approved firearms training course each year.  Allowances
will be made in accordance with applicable laws, rules, and
regulations.

Chaplains, dentists, physicians, and other positions which the
Director specifically exempts from carrying firearms are not
required to complete the firearms familiarization training
conducted at the institution and Staff Training Academy.

d.  Other Use of Firearms.  Only the Director or Director's
designee may authorize, in writing, Bureau staff to carry
Government-issued firearms for purposes not expressed in this
Program Statement.

702.  USE OF FIREARMS.  Firearms must be used only when deemed
necessary for the following Law Enforcement purposes:

- Prevent escapes;

- Prevent loss of life or serious physical injury;

- Protect government property, upon determination that
  the damage or loss of property would contribute
  directly to an escape, loss of life, or serious
  physical injury; and

- Maintain or restore control of a correctional
  institution.

The use of firearms is prohibited if force other than firearms
appear reasonably sufficient to accomplish law enforcement
purposes.  Examples are, but not limited to:

- Prevention of escape;
- Prevention serious physical injury; and
- Restoration of control in a correctional institution.

The necessity to use firearms arises when all available means of
achieving the law enforcement purpose have failed or are likely
to fail.

An employee is not required to jeopardize personal safety or the
safety of others before using firearms to prevent serious
injuries/bodily harm or death.

If use of firearms is deemed necessary, staff must shoot the
subject with every intention of hitting "center mass" to ensure
the subject is stopped.

Staff will not attempt to shoot a limb which creates a lesser chance of stopping the subject and may pose a danger to staff, other inmates, or persons in the community.  Firearms must not be used solely to disable moving vehicles or aircraft.  Firearms will only be used against the driver or other occupants of a moving vehicle when the:

- Employee has a reasonable belief that the subject poses an imminent danger of death or serious physical injury to the employee or others.

- Public safety benefits of using such force outweigh the risks to the safety of the employee or others.

As soon as practicable, medical attention must be provided to any persons injured during an incident involving use of firearms.

Firearms will not be used if the employee recognizes a potential escapee as an inmate sentenced under the Juvenile Justice and Delinquency Prevention Act.

   a.  Escape Prevention.  The use of firearms is authorized when deemed necessary to prevent an escape in the following situations.

   (1)  Perimeter Walls.  At institutions secured with perimeter walls, prior to using firearms, staff must reasonably believe that an inmate has the capability to escape.

   For example, the inmate may be carrying items that could be used to perpetrate an escape, such as, but not limited to, a ladder, grappling hook, or rope, suggesting an intent to escape.

   An employee who determines an escape is in progress must issue a verbal warning, then fire a warning shot prior to shooting the subject.

   (2)  Multiple Perimeter Fences.  At institutions secured with multiple perimeter fences, prior to using firearms, staff must reasonably believe that an inmate has the capability to escape.

   For example, the inmate may be carrying items such as, but not limited to, a ladder, blankets, grappling hooks, ropes, broom handles, or sticks, that will perpetrate an escape.

An employee who determines an escape is in progress must issue a verbal warning, then fire a warning shot prior to shooting the subject.

Verbal warnings and warning shots are not required when the employee reasonably believes there is imminent threat danger of death or serious physical injury to self or others.

When authorized, throughout this policy, warning shots should be used only if there is no apparent danger to self, other staff and inmates, or the community.

Warning shots will be fired into the ground and never into the air or in an indiscriminate direction.

The inmate is not required to be on the first/inner perimeter fence before the employee issues the warning. When the inmate actually contacts the first/inner perimeter fence in an attempt to climb or demonstrates an attempt to get on or over the first/inner perimeter fence, and the employee reasonably determines an escape is being attempted, the employee may shoot the subject.

The employee is not required to wait until the inmate is between the perimeter fences or over the first/inner fences.

(3)  Metropolitan Correctional Centers (MCCs) and Metropolitan Detention Centers (MDCs).  When an employee reasonably determines that an escape is being attempted from a MCC or MDC, the employee should give a verbal warning.  If the inmate continues, the employee may shoot the subject.  Warning shots are prohibited due to the possibility of injury to innocent bystanders.

(4)  Minimum Security Institutions.  Ordinarily, firearms are not used to prevent escapes from minimum security level institutions.  However, weapons are authorized when the escaping inmate has used or threatened to use force which is likely to cause serious physical injury or has manifested an imminent threat of death or serious physical injury to the employee, other staff and inmates, or the community.

Verbal warnings and warning shots should be used when feasible.

(5)  Escapes with Outside Assistance.  Firearms may be used against persons who are not inmates, if they are facilitating an escape and have used or threatened to use force which is likely

to cause death or serious physical injury against the employee,
other staff and inmates, or the community.

Verbal warnings and warning shots must be used when
feasible.

(6)  Escape from Escorted Trip or Prisoner Transport.  When
an employee reasonably determines an escape is being attempted
from an escorted trip or prisoner transport, the employee must
issue a verbal warning.  If the inmate continues and the escape
is occurring within the immediate environs of a correctional
institution, the employee will fire a warning shot, if feasible,
prior to shooting the subject.

Outside the immediate environs of a correctional
institution, the employee should not fire a warning shot prior to
shooting the subject due to the possibility of injury to innocent
bystanders.

Absent the use or threat of force which would likely cause
serious physical injury or a manifested imminent threat of death
or serious physical injury to the employee, other staff and
inmates, or the community, it is not permissible to use firearms
to prevent an escape of an inmate in transit to or from a minimum
security level institution.  The exception to the rule is when
the escorting employees are transporting inmates at the same time
to a minimum and non-minimum security level institutions.

(7)  Once An Escape Has Occurred.  After an escape from a
transport vehicle or an institution, and the immediate environs
has been successful, employees attempting to apprehend the
escaped prisoner may not use firearms unless there is probable
cause to believe:

(a) The subject has committed a felony involving the
infliction or threatened infliction of serious physical injury or
death.

(b)  The subject's escape would pose an imminent danger
of death or serious physical injury to the employee or others.

Note:    The phrase "after an escape from a transport
vehicle or an institution and the immediate
environs has been effectuated" should be
interpreted in the following manner:

- As long as a staff member is in continuous pursuit of an escaping inmate, whether the escape takes place from an institution, transport vehicle, or outside facility (such as a hospital), the escape has not yet been effectuated.  The use of firearms is permissible under the escaping inmate standard.

- The immediate environs of an institution is defined as the property lines of the correctional facility.  This boundary may be expanded by the Warden with the Regional Director's concurrence and should be defined as explicitly as possible.

A verbal warning should be given if it would not pose a risk of death or serious bodily injury to the officer or others.

Warning shots are prohibited due to the possibility of injury to innocent bystanders.

b.  Prevent the Loss of Life or Serious Physical Injury.  Staff may use firearms when reasonable belief exists that the subject poses a threat of death or serious physical injury to staff, inmates, or others.

Firearms will be used in the same manner as for escapes; verbal warnings and warning shots should be given, when feasible, prior to shooting the subject.

When authorized, warning shots should be used only if there is no apparent danger to other staff and inmates, or the community.  Verbal warnings and warning shots are not required when the employee reasonably believes there is imminent danger of death or serious physical injury to self or others.

In a hostage situation, once it has been contained and attempts to negotiate have begun, only the Warden may order the use of firearms to resolve the hostage situation.

Warning shots will not be fired as in an attempt to resolve a hostage situation, nor used to create a diversion.

c.  Protect Government Property.  Firearms may be used to prevent damage to or destruction of Government property when the loss of that property could contribute directly to an escape or attempted escape, serious physical injury, or loss of life.

For example, the use of firearms may be necessary when persons are attempting to damage or disable a fire truck during a fire within the institution.  If individuals attempt to break into a

building where weapons, gas, or other security risk items are stored, firearms may also be used.

Firearms must be used in the same manner as for escapes; verbal warnings and warning shots should be given, when feasible, prior to shooting the subject.  When authorized, warning shots should be used only if there is no apparent danger to other staff, other inmates, or the community.

Verbal warnings and warning shots are not required when the employee reasonably believes there is imminent danger of death or serious physical injury to self or others.

d.  Maintain or Restore Control of a Correctional Institution. Firearms may be used to maintain or restore control of a correctional institution when the employee reasonably believes the intended subject of the use of firearms is participating in a disturbance in a manner that threatens the safety of staff, other inmates, or the community.

Firearms must be used in the same manner as for escapes; verbal warnings and warning shots should be given, when feasible, prior to shooting the subject.  When authorized, warning shots should be used only if there is no apparent danger to staff, other inmates, or the community.

Verbal warnings and warning shots are not required when the employee reasonably believes there is imminent danger of death or serious physical injury to self or others.

703.  ARMED ESCORT BY COMMERCIAL AVIATION.  The Warden may authorize staff to carry firearms when transporting an inmate by commercial air carrier.

Title 14 CFR Part 108.11, Carriage of Weapons, and Part 108.21, Carriage of Passengers Under the Control of Armed Law Enforcement Escorts (1995), allows law enforcement officials, while performing their duties, to travel while armed.

Staff must notify the air carrier prior to departing the institution of the intent to carry firearms.  Staff must complete all required forms and provide required information to the carrier.

Staff must follow the procedures detailed in the above referenced regulations.

When not transporting inmates, Bureau staff, carrying firearms
aboard commercial aircraft, must declare this to the carrier and
have the weapon placed in checked baggage.

The above referenced regulations should be referred to for
additional requirements concerning the placement of firearms in
checked baggage.

704.  REPORTING REQUIREMENTS.  A written report must be submitted
to the Warden upon the discharge of any firearm, privately owned
or issued by the Bureau.  This rule applies when the employees is
on duty and off duty, except for training or recreational
purposes.

For an incident while on duty, the report must be submitted prior
to the end of the employee's duty shift.

For an incident while off duty, the report must be submitted
prior to the end of the employee's next duty shift.

The discharge of any firearm, once reported, will be investigated
and reviewed through the After-Action Reporting and Review
processes.

705.  IDENTIFICATION BADGES.  Upon request, the Correctional
Services Administrator, Central Office, will issue Bureau
identification badges in leather carrying cases to each
institution.

The Captain will maintain strict accountability of Bureau badges.
Lost or stolen badges must be reported immediately in writing to
the Correctional Services Branch, Central Office.

Except for tower and perimeter patrols and established stationary
check points, staff assigned to duties which require the carrying
of firearms will be issued a Bureau identification badge.

The badge must be displayed when necessary to establish the staff
member's authorization to carry a firearm.  Appropriate badge
holders will be provided so as to allow the employee the ability
to securely attach the badge to his or her outerwear.

Badges may not be used as methods of routine identification.

Employee procurement or possession of unauthorized badges, either
official or duplicated, is prohibited (see the Program Statement
on Standards of Employee Conduct).

706.  NON-DISCLOSURE OF BUREAU STAFF NAMES IN SHOOTING INCIDENTS.
Disclosure of an employee's name following a shooting incident
will follow the guidelines as prescribed in the Program Statement
on News Media Contacts.

CHAPTER 8
GUARD SERVICE AT LOCAL MEDICAL FACILITIES

800.  RESPONSIBILITIES

   a.  The institution's Captain and Health Services Administrator
will write a Statement of Work (SOW) and specifications,
including any special contract conditions and evaluation
criteria.  Ordinarily, the Captain will serve as Chairperson of
the evaluation panel.  The Health Services Administrator and, at
least one additional expert in institution security, will serve
as panelists.

   The institution Contract Specialist will ensure compliance with
Federal Acquisition Regulations (FAR) and other applicable
procurement requirements.

   b.  The Captain will request a contract by submitting a Request
for Purchase (BP-101 41) and be designated as the Contracting
Officer's Technical Representative (COTR).

801.  SUPERVISION REQUIREMENTS.  Competent and qualified
personnel will supervise inmates sent from Bureau institutions to
local medical facilities for medical treatment.

Either institution correctional staff or staff secured through a
contract between the institution and a local security firm,
companies, or individual will provide guard service.

Since the quality of contract guard service varies, each
institution must evaluate its specific needs and choose an option
or combination of options which best fulfills local requirements.

   a.  Custody Classification.  Contract guard service personnel
may be used for MINIMUM or LOW security inmates, assigned In
custody or lower.

   b.  Special Circumstances.  Inmates with lower custody
classifications may require special consideration for increased
supervision.  The determination for increased supervision is at
the Warden's discretion.

   c.  Pre-Trial Inmates in Bureau Custody.  Contract guard
service personnel may be used for pretrial inmates admitted to a
local medical facility when the individual would otherwise be
classified as a Minimum or Low security inmate and assigned In
custody.

Staff should review all available information on U.S. Marshal Services (USMS) prisoners being escorted on local medical trips for admission to local medical facilities.  This information may include the pretrial/holdover file, NCIC, CIM information, STG assignments, and other SENTRY information.  When possible, staff should also contact the prosecuting Assistant U.S. Attorney, U.S. Probation Officer, and/or the law enforcement agency which arrested the inmate for comments.

Wardens will consider using Bureau staff, rather than a contract guard service, when an inmate meets any of the following criteria:

- Documented escape history from a secure facility.

- Identified as a member of an organized criminal enterprise.

- CIM assignment other than Separation or State Border.

- Charged with a violent offense which is aggressive or intimidating in nature and/or likely to cause serious bodily harm or death, including, but not limited to offenses identified in the Program Statement on Categorization of Offenses, Section 6.a., b., and c.

These guidelines must be considered when staff are completing the Escorted Trip Authorization (BP-S502) form.  It is imperative that staff include relevant comments to ensure sound decisions are made.

802.  CONTRACTOR ELIGIBILITY.  In accordance with applicable government procurement and contract regulations, each institution may negotiate and enter into a contract with qualified security firms, companies, or individuals to provide guard service.

The contractor must provide either documented evidence or assurance certification that each employee used as a contract guard meets all the following requirements:

a.  Staff Qualifications.  Under no circumstances will any person, discharged by his or her employer within the past three years for cause, be employed as a guard under a Bureau contract.

Former Bureau employees discharged by the agency for cause will not be employed as a guard under a Bureau contract.  The Warden must approve requests for using personnel (other than former Bureau employees) who have been discharged.  The following elements should be considered:

- Elements of the person's removal.
- Whether employment would jeopardize the security and supervision of Bureau inmates.

A contract may not be awarded to any agency or firm unless the following qualifications for its personnel are met.

(1)  Experience Requirements

(a)  One year (2040 hours) of experience in the Armed Forces or Coast Guard which involved significant performance of guard duty of detainees or prisoners; or the equivalent experience in a Federal, state, or local government, or private organization which involved protecting/police duties.

(b)  College level training in courses such as corrections or police science may be substituted for experience at the ratio of two hours of instructions for one hour of experience.

(2)  Physical Requirements

(a)  The contractor's employees must be in good general health and able to perform job functions.

(b)  Vision must be correctable to 20/30 (snellen) in one eye.  The ability to distinguish basic colors is required.

(c)  Emotional and mental stability is essential.  The services to be performed require:

- using tact to deal with inmates,
- a keen sense of perception,
- mental alertness, and
- the ability to resolve crisis situations.

Applicants may be required to work under trying conditions for long periods of time without relief.

(d)  All prospective contract guard employees must be tested for use of illegal drugs at the institution using the same procedures as new Bureau employees.  No guard may be used unless he or she has received a negative drug test.

Any indication of illegal and/or non-prescribed drugs will disqualify the individual for employment on the Bureau's contract.

(3)  Background Investigation.  The contractor is to voucher potential employees through reference and employment checks.

(a)  The contractor must require all prospective employees to provide complete details of any conviction record. The contractor is to notify prospective employees that the Bureau will contact the National Crime Information Center/National Law Enforcement Telecommunication System (NCIC/NLETS), take fingerprints, check criminal records, and make other appropriate background checks to verify employment applications.

Prior to employment, the contractor must provide to the institutional Personnel Security Specialist or designee, each prospective employee's:

- Full name,
- Date of birth,
- State of birth,
- Sex,
- Race, and
- Social Security Number.

Prospective employees may not begin working as a guard for the contractor, supervising Bureau inmates, prior to the NCIC/NLETS clearance from the Personnel Security Specialist or designee.

(b)  The contractor must not employ any person as a guard to supervise Bureau inmates who is under supervision or jurisdiction of any parole, probation, or court/correctional authority.

(4)  Employee Training.  The contractor will train each employee in:

- Proper Bureau techniques for guarding inmates;
- Use and application of restraints;
- Integrity; and
- Use of force.

This training will be documented and submitted to the institution.

The contractor is responsible for orientation and indoctrination of contract guards.  This orientation must be sufficient to ensure that all guards comply with all established contract rules and procedures.

   b.  Bond Requirements.  The contractor must be bonded for
civil liability of not less than $250,000.

803.  CONTRACT REQUIREMENTS.  Consistent with applicable Federal
procurement regulations, most contractual language will be at
each institution's discretion; however, certain requirements will
be standard throughout the Bureau.

All contract solicitations, offers, and awards must contain the
following or similar language and provisions:

   a.  Scope of Work

     (1)  The contractor, upon verbal request from the Captain or
Operations Lieutenant, will assign guards to supervise Bureau
inmate(s) at a medical facility.

     (2)  The contractor will furnish the necessary personnel to
provide for the protection and safekeeping of those inmates.

     (3)  The contractor is responsible for the secure custody of
all Bureau inmates from the time the contractor accepts the
inmates for custody until an authorized Federal official properly
removes the inmates from their custody.

     Secure custody requires physical control of the inmate at
all times.  The contractor's physical control of the inmate must
be sufficient to prevent escape at all times.

     The contractor must maintain constant security and direct
visual observation of the inmate at all times.

     The contract guards will apply minimum restraints as
required by Bureau policy.

     (4)  The contractor will accept all Bureau inmates offered
by the institution for custody.  The institution official
relinquishing a Bureau inmate's custody will present
identification or credentials and his or her authority for
offering the inmates for custody when the contractor accepts the
prisoner.

     The contractor must present identification or credentials
and accept custody of Bureau inmates at any time, day or night,
and any day of the week.  The U.S. Marshals' release to custody
form should be used when change of custody to the guard service
is done.

b.  Notification Requirements

    (1)  The contractor must agree to provide services upon verbal request from the institution.  Requests for services are subject to being initiated at any time of day.  As much notice as possible will be given, and when possible, at least 24 hours in advance.

    It is anticipated that a considerable portion of requests for guard services may be during emergencies.  In an emergency, the contractor must respond within two hours of notification.

    (2)  The contractor will be notified of any special instructions.  If the inmate is allowed to have visitors, the contract guard must screen all visitors to prevent unauthorized individuals and introduction of contraband.

    Contract guards will require all approved visitors to produce photographic identification (e.g., drivers' license, state identification card, etc.) before visitation is permitted.  The visitor's identification will be compared to the information provided by the institution to verify a visitor's identity.

c.  Security Operations.  At a minimum, the contractor must comply with the following standards and procedures:

    (1)  Contract personnel will not permit visits to inmates unless prior authorization is received from the Warden or his or her designee.

    (2)  Contract personnel will not permit inmates to make or receive telephone calls without prior authorization from the Warden or his or her designee.

    (3)  Contract personnel will not allow inmates to send or receive correspondence or packages unless authorized by the Warden or his or her designee.  Correspondence and packages addressed to any inmate and received at the medical facility will be given to institution staff for disposition.

    (4)  Contract personnel will not allow inmates to receive money or any other item from anyone other than Bureau staff.

    Inmates will not possess other property or articles unless authorized by the Warden or designee.

    (5)  Except in emergencies arising after the contract employee assumes custody of the inmate, restraints must be applied to an inmate only as directed by institution staff.

Institution staff must specify restraint requirements for each inmate and ordinarily contract security personnel will not deviate from these requirements.  In an emergency, additional restraints may be applied to the inmate.  The institution is to be notified as soon as possible after the situation is under control.

If the institution orders restraints, but the medical facility staff request the removal of such restraints for medical or other reasons, the Captain or Operations Lieutenant must be contacted for direction.

During a life threatening medical emergency, when the restraints prevent life saving procedures or treatment, the restraints may be removed temporarily and the institution notified as soon as possible.  Constant visual observation by the contract guard must be maintained during such an emergency.  Soft restraints will be made available for such an emergency.

The Captain or Operations Lieutenant must advise contract security personnel if restraints may be removed for the inmate to use the bathroom or bathe, for medical examination, and etc.

(6)  Contract personnel may not accept any gratuity or articles of value from:

- Inmates;
- Family members of inmates; and
- Persons connected in any way with the inmate.

(7)  Contract security personnel must position themselves in the room or at a place in close proximity to the inmate, maintaining constant visual observation and be able to respond at all times to any eventuality.

Contract guards must notify the institution whenever an inmate's location or room assignment within the medical facility changes (i.e., ICU, CCU, or different room).  This does not include temporary movement for tests, treatment, therapy, etc.

(8)  Contract guard personnel may not leave the inmate's room for any reason (i.e., to smoke, eat, etc.) or order food from food establishments to be delivered to the room.

(9)  The contractor will prepare a written report when the guard believes that an inmate has committed a prohibited act. The report must be forwarded to the institution by the end of the work day.

d.  Contract Staff Management

(1)  The contractor will provide, under normal
circumstances, two guards per inmate for "IN" custody inmates and
one guard per inmate for "OUT" custody inmates, unless otherwise
directed by the Warden or Warden's designee.

In any unusual circumstance, institution staff retains the
authority to determine "when" and "if" additional guards per
inmate is necessary and the contractor must comply with that
determination.

At no time will two guards be assigned to the security of
more than one inmate with "In" custody.  If two "In" custody
inmates are confined in one room, three guards must be present.

To protect the inmate's privacy, at least one contract guard
must be of the same sex as the inmate, in that, it may become
necessary for contract guards to conduct visual searches of
inmates.

(2)  The contractor must replace any contract employees who,
for any reason, are unacceptable to institution staff who is
authorized to make the determination.  Contract employees, found
to be unacceptable, will not be used to guard Bureau inmates
without the Warden's written approval.

(3)  The contractor will provide a contact person on a 24-
hour basis, seven days a week.  Institution staff must be
provided with a telephone number to contact the contractor's
operations desk at any time.

(4)  The contractor will provide a duty roster of all
employees assigned to the Bureau contract.  The roster will be
used to verify the signature of each employee reporting for duty
and all activities occurring during that employee's tour.  The
duty rosters will be available to institution staff for
inspection, upon request, and must be maintained for at least 10
years.

(5)  Security personnel on each shift are required to
maintain a log.  Any information either oral or written must be
considered strictly confidential and must not be divulged to
anyone except institution staff.

(6)   The contractor will provide adequate supervisory staff
to ensure frequent and random security inspections of contract
employees.  These security inspections, at a minimum, will be
conducted once each shift.  The supervisor will document the
inspections in the assigned security personnel's log.

(7)   The contractor must provide and maintain a current list
of all employees who are used to maintain custody of Bureau
inmates.  This list will be furnished to institution staff and
kept current for verification of employment.

(8)   The contractor must provide the contract employees
photo identification cards.  The identification cards must be
shown to institution staff before the inmate's custody is
transferred to the contractor employee.  Additionally, the
identification cards must be presented upon request during Bureau
staff security visits at the medical facility.

Institution staff will relinquish custody to the contract guard
by completing a Transfer Receipt form BP-283(58).  The releasing
institution staff member will retain a copy of this receipt.

e.  Contract Guard Responsibilities

(1)   The contractor's personnel will not represent
themselves as employees of the U.S. Government, Department of
Justice, Bureau of Prisons, or the institution.

Contract personnel are responsible for maintaining good
relations with hospital employees.  The contractor must report
any conflict or difficulty involving contract personnel, and
hospital employees or others in the community to the Warden or
designee immediately.

(2)   Ordinarily, the contractor will use uniformed contract
personnel to guard inmates.  On rare occasions, the contractor
may be required to provide non-uniformed personnel.  The
contractor must comply with the institution's request for non-
uniformed personnel.

If uniforms are used, the uniform must be consistent within
the contract company/firm and standard for all security personnel
used to provide security of Bureau inmates.

Whether in uniform or plain clothes, security personnel must
present a neat appearance at all times.

(3) Contract security personnel must have at least seven
hours off-duty time prior to commencing a new tour of duty.

A continuous tour of duty must not exceed a 12-hour duration, followed by, at least, seven hours off-duty time as stated above.

The Warden or designee may grant exceptions at the contractor's request during emergency situations.

(4)  Contract guards will not be permitted to supervise a Bureau inmate if there is any detection of alcohol or medication that could impair mental or physical performance.

Guards and supervisors must refrain from consuming alcoholic beverages for at least eight hours prior to reporting for duty. No alcoholic beverages will be consumed while on duty.

(5)  The contractor's personnel must not smoke at any time during the tour of duty.

(6)  The contractor's personnel will not possess firearms while supervising Bureau inmates.  If the Warden determines weapons are required to supervise inmates confined in outside medical facilities, only qualified Bureau staff will be used.

f.  Use of Force Involving Contract Personnel

(1)  All incidents involving the use of force on an inmate by contract guard personnel must be reported immediately to the Captain or Operations Lieutenant.  Additionally, each contract guard who was involved in and/or witnessed the incident must submit a memorandum to include all aspects of the incident.

- Any injury to guards, the inmate, or medical personnel;
- Type of restraint(s) used;
- Description of the incident; and
- Any other significant information regarding the use of force incident.

(2)  After the incident is reported to the institution, the institution's Special Investigative Agent (SIA) or Special Investigative Supervisor (SIS) will conduct a thorough investigation and prepare a written report to the Warden.

(3)  At the conclusion of the SIS/SIA investigation, an after-action review team will review all facts pertaining to the incident.  This review team is comprised of the following institution staff:

- Warden,
- Associate Warden (Correctional Services),
- Health Services Administrator, and
- Captain.

If the review team determines the contract guard personnel used excessive force, the incident will be reported to the Bureau's Office of Internal Affairs.

g.  Termination of Contract Supervision Requirements

(1)  Upon an inmate's release from the hospital, contract guard supervision of the inmate is no longer required.  The supervising contract guard will contact the institution Captain or Operations Lieutenant.

(2)  Institution staff must be dispatched to assume custody of the inmate.  Upon arrival at the medical facility, Bureau staff must adhere to the following guidelines.

    (a)  Bureau staff must furnish appropriate official photo identification to contract guard staff prior to assuming custody of the inmate.

    (b)  The inmate must be thoroughly searched.

    (c)  Appropriate restraints must be applied to the inmate.

    (d)  The contractor personnel must relinquish custody to Bureau staff by completing a Transfer Receipt form BP-283(58).  The releasing contract guard retains one copy of this receipt.

    (e)  The inmate must be transported to the institution or other location, in accordance with procedures as outlined in the Program Statement on Escorted Trips.

LIST OF ATTACHMENTS

Attachment A          Retention of Documents

Attachment B          Official Count Form

Attachment C          Cost/Impact Statement

Attachment D          Lockdown Accountability Census Form

Attachment E          Post Order Review Sheet

PS 5500.14
10/19/2012
Attachment A, Page 1

RETENTION OF DOCUMENTS

1. Daily and Quarterly Roster . . . . . . . . . . . . . 10 Years
2. Urine Lab Reports - Positive. . . . . . . . . . . Central File
3. Urine Lab Reports - Negative. . . . . . . . . . Log - Destroy
4. Monthly Urine Surveillance Reports. . . . . . . . . . . 1 year
5. Notification to Visitors Form. . . . . . . . . . . . . 1 year
6. Administrative Detention Order. . . . . . . . . . . 90 days
7. Unit Log books. . . . . . . . . . . . . . . . . . . 10 years
8. Lieutenant's Log. . . . . . . . . . . . . . . . . . 10 years
9. Monthly Reports. . . . . . . . . . . . . . . . . . . 1 year
10. Incident Reports - Yellow Copy - Research. . . . . . . 1 year
11. Bus trip Log. . . . . . . . . . . . . . . . . . . . 2 years
12. Form 383 (R&D) . . . . . . . . . . . . . . . . . . . 3 years
13. Informal Resolution. . . . . . . . . . . . . . . . . 1 year
14. Tort Claim Response. . . . . . . . . . . . . . . . 10 years
15. Missing - Lost Credentials/Badges. . . . . . . . . Until Found
16. Marshals Receipt - Control,
Lieutenant's Copy. . . . . . . . . . . . . . . . . . . 30 days
17. Detail Census Checks. . . . . . . . . . . . . . . . 30 days
18. Monthly Lockdown Accountability. . . . . . . . . . . 1 year
19. Outside Contractor's Inventory. . . . . . . . . 30 days after
20. Rear Gate Detail Log. . . . . . . . . . . . . . . . . 1 year
21. Rear Gate Vehicle Log. . . . . . . . . . . . . . . . 1 year
22. Restricted Key Issue Form. . . . . . . . . . . . . . 30 days
23. Official Visitors Forms. . . . . . . . . . . . . . . 1 year
24. Alcohol Testing Log. . . . . . . . . . . . . . . . 5 months
25. Kitchen Knife Report. . . . . . . . . . . . . . . . 30 days
26. Missing Tool Report . . . . . . . . . . . . . . . . 2 years
27. Fire and Security Inspection Form . . . . . . . . . 90 days
28. Front Entrance Visitor's Logs. . . . . . . . . . . . 10 year
29. Assignment Cards, while employed. . . . . . . . . . Indefinite
30. Daily Key and Equipment Inventories. . . . . . . . 30 days
31. Escort Instructions. . . . . . . . . . . . . . . . . 1 year
32. Shakedown Logs (after completion). . . . . . . . . 5 years
33. Internal Operational Reviews and
Response. . . . . . . . . . . . . . . . . . . . . . 2 years
34. Quarterly Reports. . . . . . . . . . . . . . . . . . 1 year
35. Program Reviews/Audit Responses. . . . . . . . . . 3 years
36. Emergency Plan Signature Sheet. . . . . . . . . . . 2 years
                                        project completion
37. Reports of Incidents. . . . . . . . . . . . . . . . SIS File
39. Special Housing Unit Sign-in Log. . . . . . . . . 10 years
40. SIS Files (After Release) . . . . . . . . . . . . Indefinite
41. Bus Trip Reports. . . . . . . . . . . . . . . . . . 2 years

```
                                             PS 5500.14
                                             10/19/2012
                                  Attachment A, Page 2
```

            RETENTION OF DOCUMENTS (CONTD.)

```
42. Monthly weapons and chemical agents
    inspections    . . . . . . . . . . . . . Current year
                                             plus previous
                                             2 years
43. Quarterly emergency equipment
    testing, inventory and inspection.. . . . . . . Current year
                                             plus previous
                                             two years
44. Preventive maintenance log/report.. . . . . . . Five years
45. 5 x 8 card, alphabetical listing,
    Tel-key, numerical listing and
    related documentation.. . . . . . . . . . . Keep current
                                             and destroy out
                                             dated documents
46. Monthly fence checks. . . . . . . . . . . . . Two years
47. Emergency equipment location
    inventories.. . . . . . . . . . . . . . . Current year
                                             plus previous
                                             two years
48. Equipment sign out form.. . . . . . .   Current six months
                                     plus previous two years
49. Perpetual Audit documentation  . . . . . . . . . One year
50. Outdated Post Orders
    hardcopy or diskette . . . . . . . . . . . . . 3 years
```

PS 5500.14
10/19/2012
Attachment B, Page 1

DATE: _____
TIME: _____AM_____P.M.

_____
(INSTITUTION)
OFFICIAL COUNT FORM

| UNIT | C E N S U S | F O O D S V C | H O S P I T A L | C L O R O O M | U N I C O R | C O M M I S S A R Y | P O W E R P L A N | B A R B E R | | | | O U T C O U N T | C O U N T V E R I | U N I T C O U N T | U N I T |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | |
| TOTAL | | | | | | | | | | | | | | | |
| COUNT VERIFY | | | | | | | | | | | | | | | |

OUT COUNT SECTION

Official Preparing Count: _____

Official Taking Count: _____

Count Cleared - Time: _____

PS 5500.14
10/19/2012
Attachment C, Page 1

COST/IMPACT STATEMENT

Instructions:  The following impact statement is to be completed
as a required element of all After-Action Reports regarding major
incidents occurring at institutions.  All amounts must be clearly
labeled as estimates or actual final figures.  When major
portions of the impact statement are based on estimates, an
amended impact statement must be filed once more accurate
cost/impact information is available.  Prepare separate forms for
each institution or regional office impacted (i.e., multiple
institutions sending SORT teams).

Reporting Institution:_____

Incident Site: _____

Incident: _____

Incident Date: _____

Overtime:

| Cost Center | | Hrs | Cost |
|---|---|---|---|
| Corr Svc | 315 | _____ | _____ |
| Bus | 373 | _____ | _____ |
| Locksmith | 387 | _____ | _____ |
| Food Svc | 332 | _____ | _____ |
| Medical | 350 | _____ | _____ |
| Mech Svc | 334 | _____ | _____ |
| Other | ____ | _____ | _____ |
| | ____ | _____ | _____ |
| | ____ | _____ | _____ |
| Total | | _____ | $_____ |

Facilities Damage/Cost Impact:

Facilities damage/cost impact should list specific buildings,
areas, and repair costs for each.  Temporary emergency security
features should also be accounted for (temporary fences, towers,
etc.).

_____
_____
_____
_____
_____

Total:  $ _____

PS 5500.14
10/19/2012
Attachment C, Page 2

Medical Treatment Cost Statement:

Cost Center          Staff Injuries          Inmate Injuries

BOP        350       _____             _____
non-BOP    325       _____             _____

Totals               $_____              $_____

Comments (number of staff/inmates hospitalized, etc.):

_____
_____
_____
_____
_____

Transfers Cost Statement:
Number of inmates transferred (attach bus manifests):

_____
_____
_____
_____

Expenses (fuel, ISM overtime, bus crew, etc.):

_____
_____
_____
_____

Total            $_____

Recap:

Overtime         _____

Facilities       _____

Medical          _____

Transfer         _____

Other            _____

Total            $_____

_____
Name/Signature, Title, and Date

LOCKDOWN ACCOUNTABILITY CENSUS DETAIL FORM


Detail or Location: _____

INMATES UNAUTHORIZED (PRESENT)

| NAME | REG NO | UNIT | JOB | REMARKS |
|------|--------|------|-----|---------|
|      |        |      |     |         |
|      |        |      |     |         |
|      |        |      |     |         |
|      |        |      |     |         |
|      |        |      |     |         |
|      |        |      |     |         |
|      |        |      |     |         |
|      |        |      |     |         |
|      |        |      |     |         |
|      |        |      |     |         |
|      |        |      |     |         |
|      |        |      |     |         |
|      |        |      |     |         |
|      |        |      |     |         |
|      |        |      |     |         |
|      |        |      |     |         |
|      |        |      |     |         |
|      |        |      |     |         |
|      |        |      |     |         |

PS 5500.14
10/19/2012
Attachment D, Page 2

ASSIGNED INMATES (ABSENT AND UNACCOUNTED FOR)

| NAME | REG NO | REMARKS |
|------|--------|---------|
|      |        |         |
|      |        |         |
|      |        |         |
|      |        |         |
|      |        |         |
|      |        |         |
|      |        |         |
|      |        |         |
|      |        |         |
|      |        |         |
|      |        |         |
|      |        |         |
|      |        |         |
|      |        |         |
|      |        |         |
|      |        |         |
|      |        |         |
|      |        |         |

_____          _____
Printed Name                              Signature


_____
Date

PS 5500.14
10/19/2012
Attachment D, Page 3

LOCKDOWN ACCOUNTABILITY CENSUS CHECKLIST

To be completed by the Lieutenant supervising and managing the
lockdown accountability check.

INMATES UNAUTHORIZED (PRESENT)

| NAME | REG NO | DETAIL | I/R WRITTEN | REMARKS |
|------|--------|--------|-------------|---------|
|      |        |        |             |         |
|      |        |        |             |         |
|      |        |        |             |         |
|      |        |        |             |         |
|      |        |        |             |         |
|      |        |        |             |         |
|      |        |        |             |         |
|      |        |        |             |         |
|      |        |        |             |         |
|      |        |        |             |         |
|      |        |        |             |         |
|      |        |        |             |         |
|      |        |        |             |         |
|      |        |        |             |         |
|      |        |        |             |         |

PS 5500.14
10/19/2012
Attachment D, Page 4

ASSIGNED INMATES ABSENT AND UNACCOUNTED FOR

| NAME | REG NO | DETAIL | I/R WRITTEN | REMARKS |
|------|--------|--------|-------------|---------|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

```
+)))))))))))))))))))))))))))))))))))))))))))))))))))))))))))),
*                        R E C A P                          *
/)))))))))))))))))))))))))))))))))))))))))))))))))))))))))))))1
*Total from page 1: ____ (inmates in unauthorized areas)    *
*Total from page 2: ____ (inmates absent and unaccounted for)*
*Balance: ____                                              *
*Did totals balance out (Y/N): ____                         *
*                                                           *
*                                                           |
*Total inmates unaccounted for after reporting: ___         *
*(list names and register numbers below)                    *
*_____  _____  _____       *
*_____  _____  _____       *
*_____  _____  _____       *
*_____  _____  _____       *
*_____  _____  _____       *
*_____  _____  _____       *
.)))))))))))))))))))))))))))))))))))))))))))))))))))))))))))-
```

_____          _____
Lieutenant (Printed Name)                  Signature

_____
     Date

PS 5500.14
10/19/2012
Attachment E, Page 1

Title and Location of Post Orders

Name of Staff (Printed/Signature)       Title/Position          Date

_____       _____       _____

_____       _____       _____

_____       _____       _____

_____       _____       _____

_____       _____       _____

_____       _____       _____

_____       _____       _____

_____       _____       _____

_____       _____       _____

_____       _____       _____

_____       _____       _____

_____       _____       _____

_____       _____       _____

_____       _____       _____

_____       _____       _____

_____       _____       _____

_____       _____       _____

_____       _____       _____

_____       _____       _____